PRESENT:  All the Justices

TRAVIS BURNS

v.    Record No. 110754

GREGORY JOSEPH GAGNON, ET AL.

OPINION BY
JUSTICE LEROY F. MILLETTE, JR.
April 20, 2012

GREGORY JOSEPH GAGNON

v.    Record No. 110767

TRAVIS BURNS, ET AL.

FROM THE CIRCUIT COURT OF GLOUCESTER COUNTY
R. Bruce Long, Judge

These companion appeals arise out of a personal-injury suit brought by a former Gloucester High School (GHS or school) student who was injured in a fight with another student on school grounds.  On the morning of the fight, an assistant principal at the school received a report that the fight would occur sometime that day.  He did not act on the report before the fight.

The injured student sued the other student involved in the fight, a third student who encouraged the fight, and the assistant principal, asserting claims for simple and gross negligence, assault, and battery.  A jury returned a verdict against all three defendants and awarded the injured student a total of $5 million in damages, with a different amount awarded against each defendant.  The circuit court entered judgment on

the verdict but refused to hold the defendants jointly and severally liable.

We granted the assistant principal's appeal[1] and the injured student's cross-appeal to consider (1) whether the assistant principal owed the injured student a legal duty; (2) whether the assistant principal is entitled to the protection of sovereign immunity; (3) whether there was evidence to support the injured student's proffered jury instruction on gross negligence; (4) whether the deposition of an absent witness was admissible; and (5) whether intentional and negligent tortfeasors can be held jointly and severally liable. For the reasons that follow, we reverse in part and remand the case to the circuit court for a new trial.

I.

A.

At around 9:00 a.m. on December 14, 2006, Shannon H. Diaz, a student at GHS, met with Principal Layton H. Beverage and Vice Principal W. R. Travis Burns to discuss a disciplinary offense. When the meeting ended, Diaz informed Burns that, according to messages sent through the social-networking website MySpace, his friend and fellow student Gregory J. Gagnon was going to get into a fight with another student

---

[1] Neither of the other two defendants appealed; thus, the judgment is final as to them.

sometime that day. Burns wrote down Gagnon's name and told Diaz that he would "alert [his] security and we'll make sure this problem gets taken care of." Burns did not, however, act on Diaz' report that morning.

Roughly two hours after Diaz and Burns met, Gagnon was approached by another student, James S. Newsome, Jr. (Newsome), in the school's cafeteria. The two exchanged words, and Newsome's sister and fellow student, Christine D. Newsome (Christine), who was standing behind Newsome, said, "either . . . hit [Gagnon] or walk away." Newsome then punched Gagnon once in the face, knocking his head back into a brick pillar.

### B.

In 2009, Gagnon filed an amended complaint against Burns, Newsome, and Christine, asserting claims for simple and gross negligence, assault, and battery. With respect to Newsome and Christine, Gagnon alleged that Newsome assaulted and battered him, and that Christine aided and abetted the assault and battery. As for Burns, Gagnon alleged that he owed him various duties of care and that he breached those duties by, among other things, (1) failing to implement necessary policies and procedures to "rein[] [in] student-on-student fights" at the school; (2) taking no action in response to Diaz' report; and (3) failing to protect him from Newsome's conduct. Gagnon claimed that the defendants' intentional and negligent acts

3

caused him to suffer permanent disability, including a "present and future brain injury."  He sought judgment against all three defendants, jointly and severally, in the amount of $9,000,000.[2]

Burns filed a demurrer and plea in bar, arguing that he owed no legal duty to Gagnon and that he was immune from Gagnon's simple negligence claim under both Code § 8.01-220.1:2 and the common law.  In addition, Burns contended that Gagnon's allegations were insufficient to support a claim against him for gross negligence.

                              C.

The circuit court held an evidentiary hearing on Burns' plea in bar.  At that hearing, Burns testified that, in 2006, he was the assistant principal at GHS in charge of ninth-grade student discipline and that his duties included receiving reports of disciplinary offenses.  When asked to recount the events of December 14, 2006, Burns said that he and Beverage met with Diaz that morning to discuss a disciplinary matter. Burns testified that, after the meeting, Diaz told him that, based on "some exchanges" happening on MySpace, there was a fight that "may occur between . . . Gagnon[] and another boy." According to Burns, Diaz did not give him the name of the other student or the date, time, or place of the fight.  Burns

_____

[2]  Gagnon originally prayed for punitive damages as well, but he later abandoned that claim.

4

further testified that "the only thing [he] did" in response to Diaz' report "was [he] took . . . Gagnon's name down and . . . told [Diaz] that [he] would look into the matter."

When asked why he did not act on Diaz' report, Burns said that he had other priorities to attend to that morning and that he did not consider the report to present an immediate concern. Yet Burns acknowledged that, had he "see[n the report] as pressing," he could have located Gagnon that morning using the school's computer system, could have asked one of the school's security guards to remove Gagnon from class, and could have had Gagnon brought to his office.

Over Burns' objection, Gagnon introduced portions of Diaz' de bene esse deposition at the hearing, representing to the circuit court that Diaz was unable to appear because he was on active military duty. In the admitted portions, Diaz testified that he told Burns on December 14, 2006, that Gagnon was going to get into a fight with another student sometime that day, but that he did not say who the other student would be. According to Diaz, Burns told him that he would "alert security" and "make sure this problem [was] taken care of." But Diaz said that Burns never asked him for the name of the other student or for the time or place of the fight.

Gagnon's mother and father both testified at the hearing that Burns spoke to them individually in the days following the

5

fight and apologized for "dropp[ing] the ball."  And a deputy assigned to GHS testified that soon after the fight, Burns admitted that "he believe[d] he screwed up."  During his testimony, Burns denied making these admissions.

The circuit court denied Burns' demurrer and plea in bar. On the threshold issue of legal duty, the circuit court held that Burns owed Gagnon "legal duties," but it did not specify what those duties were.  As to whether Burns was entitled to common-law sovereign immunity, the circuit court applied the four-factor test established in James v. Jane, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980), and explained in Messina v. Burden, 228 Va. 301, 312-13, 321 S.E.2d 657, 663-64 (1984), finding that the only factor that was contested by the parties was whether Burns' alleged wrongful act was discretionary or ministerial.  Relying on B.M.H. v. School Bd. of City of Chesapeake, 833 F. Supp. 560, 571 (E.D. Va. 1993), as persuasive authority, the circuit court concluded that Burns' omitted act of "notifying school security of the reported impending physical altercation or otherwise investigating the report of . . . Diaz" was ministerial.  The circuit court thus held that Burns was not entitled to common-law sovereign immunity.  It also held that Burns was not entitled to statutory sovereign immunity because Code § 8.01-220.1:2 –

6

which provides, among other things, civil immunity to teachers under certain circumstances — did not apply to Gagnon's claims.

The circuit court further concluded that "Burns' acts or omissions did not constitute gross negligence, but did, for purposes of the plea in bar, make out a sufficient case of simple negligence to permit the issue to be determined by a jury." Lastly, the circuit court denied Burns' post-hearing motion to strike Diaz' deposition, finding that the deposition was taken in another action with substantially similar parties and issues,[3] that Diaz was an unavailable witness, and that Burns' counsel had participated in the deposition.

### D.

The case proceeded to a nine-day jury trial in which Burns and Gagnon presented substantially the same evidence that they offered at the plea in bar hearing. In addition, Burns testified that he asked Diaz the name of the other student who would be involved in the fight with Gagnon, but that Diaz said that he did not know. According to Burns, Diaz also said that he did not know the other student's grade or "what the conflict was about." Burns further testified that he believed that Diaz had a "credibility issue" because he was slow to admit that he, and not some other students that he had initially implicated,

---

[3] Gagnon originally sued Burns and the Gloucester County School Board. That case was nonsuited, and this case was filed against Burns, Newsome, and Christine.

7

had committed the disciplinary offense that was being investigated on the morning of the fight.

At the close of all evidence, the circuit court considered jury instructions and verdict forms. As relevant here, Gagnon proposed an instruction and special interrogatory on gross negligence. The circuit court refused both, citing its prior ruling at the plea in bar stage that Burns' acts or omissions did not constitute gross negligence.

With respect to damages, Gagnon argued that Burns should be liable for all of the damages awarded by the jury, even those damages that resulted from Newsome's assault and battery. Gagnon accordingly offered a "general personal injury and property damage" instruction that did not separate the damages awards for each defendant. The circuit court rejected the instruction, ruling that damages for assault and battery would be specific to Newsome in the instructions.

Gagnon proposed that a single verdict form be used, but the circuit court expressed its preference for separate forms for all three defendants. The circuit court thus prepared a form for each defendant, which asked the jury to find whether the particular defendant was liable, and, if so, to list the amount of damages as to that defendant.

The jury returned a verdict in favor of Gagnon against Burns in the amount of $1,250,000, against Newsome in the

amount of $3,250,000, and against Christine in the amount of $500,000. Burns asked the circuit court to give an interrogatory to the jury asking whether it was its intent to render separate damages verdicts for each defendant. Gagnon objected to the interrogatory, stating that the jury rendered a verdict on the forms provided by the circuit court. Although the circuit court thought it clear that the jury had rendered separate verdicts, it nonetheless asked the jury whether its intent was that each defendant be responsible only for the amount awarded against him or her, and not liable for the amounts awarded against the other defendants; and the jury responded in the affirmative.

### E.

In a post-trial motion, Gagnon asked the circuit court to hold the defendants jointly and severally liable for the total $5,000,000 verdict. He argued that his injury was indivisible and that the jury found all three defendants liable as joint tortfeasors. Moreover, he maintained, the jury had no right to dictate the legal consequences of its damages calculation, and Code § 8.01-443 commanded joint and several liability. The circuit court denied the motion and entered judgment in accordance with the verdict.

Burns and Gagnon now cross-appeal. Burns challenges the circuit court's rulings on the issues of legal duty, sovereign

9

immunity, and Diaz' deposition.  And Gagnon challenges the circuit court's rulings on the issues of gross negligence and joint and several liability.

## II.

"Negligence," we have long said, "is not actionable unless there is a legal duty, a violation of the duty, and consequent damage."  Marshall v. Winston, 239 Va. 315, 318, 389 S.E.2d 902, 904 (1990).  The first question that we must answer, then, is whether Burns owed Gagnon a legal duty.  "The issue whether a legal duty in tort exists is a pure question of law," and thus is subject to de novo review.  Kellermann v. McDonough, 278 Va. 478, 487, 684 S.E.2d 786, 790 (2009); see also Fox v. Custis, 236 Va. 69, 74, 372 S.E.2d 373, 375 (1988).

The circuit court ruled that Burns owed Gagnon "legal duties," but it did not indicate what those duties were. Gagnon argues, as he did below, that Burns owed three:  (1) an elevated duty of care to protect him from Newsome's conduct; (2) a common-law duty of ordinary care; and (3) an assumed duty to investigate Diaz' report and notify school security about the fight.

## A.

"We have consistently held that 'generally a person does not have a duty to protect another from the conduct of third persons.' "  Kellermann, 278 Va. at 492, 684 S.E.2d at 793

10

(quoting Didato v. Strehler, 262 Va. 617, 628-29, 554 S.E.2d 42, 49 (2001)).  "This is particularly so when the third person commits acts of assaultive criminal behavior because such acts cannot reasonably be foreseen."  Burdette v. Marks, 244 Va. 309, 311-12, 421 S.E.2d 419, 420 (1992).  There is an exception to the general rule, however, where "a special relation exists (1) between the defendant and the third person which imposes a duty upon the defendant to control the third person's conduct, or (2) between the defendant and the plaintiff which gives a right to protection to the plaintiff."  Id. at 312, 421 S.E.2d at 420.

Whether a special relationship exists between a principal and a student is a question of first impression in this Court.  "Examples of special relationships we have recognized between a defendant and a plaintiff include common carrier-passenger, business proprietor-invitee, innkeeper-guest, and employer-employee with regard to the employer's potential duty of protecting or warning an employee."  Kellermann, 278 Va. at 492, 684 S.E.2d at 793.  While "this list of relationships that give rise to a special relationship is not exhaustive," we have exercised caution in expanding it to include new relationships.  See id.

"When a negligence claim is made against a public official, a distinction must be drawn between the official's

11

public duty owed to the citizenry at large and the official's special duty owed to a specific, identifiable person or class of persons." Burdette, 244 Va. at 312, 421 S.E.2d at 421. Only a violation of the latter will give rise to liability "because it is not in society's best interest to subject public officials to potential liability for every action undertaken." Id.

In determining whether a special relationship exists under the facts presented here, "it is important to consider whether [Burns] reasonably could have foreseen that he would be expected to take affirmative action to protect [Gagnon] from harm." Id. Although Diaz told Burns on the morning of the fight that Gagnon was going to be in a fight with another student sometime that day, Diaz did not tell Burns who the other student would be or the time or place of the fight.

These facts, we think, make this case distinguishable from Burdette, in which we held that a deputy sheriff owed a duty to protect a motorist from the criminal conduct of a third person because the particular facts alleged created an exception to the general rule. Id. at 312-13, 421 S.E.2d at 421. In that case, the deputy sheriff responded to the scene of a car crash, where he witnessed the motorist being attacked by a third person, with first a shovel and then an iron pipe. Id. at 310-11, 421 S.E.2d at 420. Despite the motorist's calls for help,

12

the deputy sheriff did not intervene.  Id. at 311, 421 S.E.2d at 420.  We concluded that a special relationship existed between the deputy sheriff and the motorist, because the sheriff "knew or should have known that [the motorist] was in great danger of serious bodily injury or death."  Id. at 312, 421 S.E.2d at 421.

In this case, by contrast, there is no evidence in the record suggesting that Burns knew or should have known that Gagnon "was in great danger of serious bodily injury or death." Id.  Again, all that Diaz told Burns was that, according to messages sent through MySpace, there would be a fight involving Gagnon sometime that day.  Moreover, Burns was not present when Newsome punched Gagnon; thus, unlike the deputy sheriff in Burdette, Burns was not in a position to step in and stop the fight.

This case is also distinguishable, in our view, from Taboada v. Daly Seven, Inc., 271 Va. 313, 626 S.E.2d 428 (2006), a case upon which Gagnon heavily relies.  There we reaffirmed that a special relationship exists between an innkeeper and guest.  Id. at 323, 626 S.E.2d at 432.  In doing so, we noted that the innkeeper-guest special relationship dates back to the Middle Ages when travellers were "[e]xposed . . . to robbery and violence" while on their pilgrimages, and thus were "compelled to repose confidence" in innkeepers when

13

stopping for the night; "and hence there grew up the salutary principles that a host owed his guest the duty, not only of hospitality, but also of protection." Id. at 323 n.4, 626 S.E.2d at 432 n.4 (quoting Kveragas v. Scottish Inns, Inc., 733 F.2d 409, 412 (6th Cir. 1905)).

Gagnon argues that the principal-student relationship is similar to the innkeeper-guest relationship and therefore asks us to recognize it as a special relationship, too. Just as the guest entrusts his safety to the innkeeper, Gagnon maintains, so also the student entrusts his safety to the principal. In addition, Gagnon contends, the student, like the guest, has little ability to control his environment and thus relies on the principal to make the school safe, just as the guest relies on the innkeeper to make the inn safe.

We decline Gagnon's invitation to expand our special-relationship jurisprudence to include the principal-student relationship. For one thing, the innkeeper-guest relationship has long been recognized by this and other courts as a special relationship. See id. at 323 & n.4, 626 S.E.2d at 432-33 & n.4. Indeed, as noted above, its status as such in the common law dates back to the Middle Ages. Id. at 323 n.4, 626 S.E.2d at 432 n.4. The principal-student relationship, on the other hand, has no history – deep-rooted or otherwise – in the common

14

law.  In fact, Gagnon fails to point us to even a single case in which a court has recognized it as a special relationship.

In addition, we have repeatedly been hesitant to recognize a special relationship where a public official is being sued for acts committed in his official capacity.  See, e.g., Marshall, 239 Va. at 319, 389 S.E.2d at 905 (holding that a sheriff and a jailer had no special relationship with a member of the general public); Fox, 236 Va. at 75-76, 372 S.E.2d at 376 (concluding that two parole officers did not have a special relationship with a parolee).  The reason for our hesitation, we have explained, is that "it is not in society's best interest to subject public officials to potential liability for every action undertaken."  Burdette, 244 Va. at 312, 421 S.E.2d at 421.

## B.

This Court recently held that under the common law, "when a parent relinquishes the supervision and care of a child to an adult who agrees to supervise and care for that child, the supervising adult must discharge that duty with reasonable care."  Kellermann, 278 Va. at 487, 684 S.E.2d at 790.  But we were careful to note that the supervising adult "is not an insurer of the child's safety.  Rather, the supervising adult must discharge his or her duties as a reasonably prudent person would under similar circumstances."  Id.

15

Gagnon argues that, pursuant to our holding in <u>Kellermann</u>, Burns had a common-law duty to supervise and care for him. Admittedly, the facts presented in this case are markedly different from those we confronted in <u>Kellermann</u>, where the defendants agreed to supervise and care for their daughter's teenage friend.  <u>Id.</u> at 484-85, 684 S.E.2d at 788-89.  We nonetheless agree with Gagnon that the duty recognized in that case is applicable here.

By law, Gagnon's parents had to send Gagnon to school, where it was the responsibility of Burns and other school officials to supervise and ensure that "students could . . . have an education in an atmosphere conducive to learning, free of disruption, and threat to person."  Thus, just as the defendants in <u>Kellermann</u> owed a duty to supervise and care for their daughter's teenage friend, Burns owed a duty to supervise and care for Gagnon.  That does not mean, however, that Burns was an insurer of Gagnon's safety; instead, like the defendants in <u>Kellermann</u>, Burns can only be held liable if he failed to "discharge his . . . duties as a reasonably prudent person would under similar circumstances."  <u>Id.</u> at 487, 684 S.E.2d at 790.

## C.

We have adopted the common-law principle of assumption of a duty.  <u>Didato</u>, 262 Va. at 629, 554 S.E.2d at 48.  Under that

16

principle, "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all."  Kellermann, 278 Va. at 489, 684 S.E.2d at 791 (quoting Nolde Bros. v. Wray, 221 Va. 25, 28, 266 S.E.2d 882, 884 (1980)) (quotation marks omitted).  As noted earlier, whether a defendant owes a plaintiff a duty in tort is generally a question of law.  But when the issue is not whether the law recognizes a duty, but rather whether the defendant by his conduct assumed a duty, the existence of that duty is a question for the fact-finder.  Id. at 490, 684 S.E.2d at 791-92; Didato, 262 Va. at 629, 554 S.E.2d at 48.

In accordance with the principle of assumption of a duty, an actor who fails to exercise reasonable care in performing his undertaking may be subject to liability for physical harm caused not only to the one to whom he has agreed to render services, but also to a third person.  Liability to the latter is addressed in Restatement (Second) of Torts § 324A, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > (a) his failure to exercise reasonable care increases the risk of such harm, or

17

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Gagnon argues that Burns assumed a duty to investigate Diaz' report and notify school security about the fight under the principle of assumption of a duty, because Burns told Diaz that he would "alert security," "look into it," and "take care of it."  While there is evidence in the record pertinent to the issue whether Burns assumed this duty, neither the circuit court at the plea in bar hearing nor the jury at trial made such a finding.  In truth, they were never asked to.  Because we cannot decide the issue as a matter of law, it is to be decided by the fact-finder on remand.  We stress, however, that Burns can only be subject to liability for Gagnon's physical harm under Restatement § 324A if Gagnon proves, first that Burns undertook to investigate Diaz' report and notify school security about the fight, and then either:  (1) that Burns' failure to exercise reasonable care in performing his undertaking increased the risk of the harm; (2) that Burns undertook to perform a duty owed by Diaz to Gagnon; or (3) that the harm was a result of Diaz' or Gagnon's reliance upon Burns' undertaking.

18

III.

Having concluded that Burns owed at least a common-law duty to supervise and care for Gagnon, we now turn to the question whether Burns is entitled to the protection of sovereign immunity. " 'The existence of sovereign immunity is a question of law that is reviewed de novo.' " Lee v. City of Norfolk, 281 Va. 423, 439, 706 S.E.2d 330, 338 (2011) (quoting City of Chesapeake v. Cunningham, 268 Va. 624, 633, 604 S.E.2d 420, 426 (2004)).

Burns asserts that he is immune from Gagnon's simple negligence claim under both Code § 8.01-220.1:2 and the common law. We disagree that the statute affords Burns immunity, but agree that the common law does.

A.

Entitled "Civil immunity for teachers under certain circumstances," Code § 8.01-220.1:2, in relevant part, provides:

> A. Any teacher employed by a local school board in the Commonwealth shall not be liable for any civil damages for any acts or omissions resulting from the supervision, care or discipline of students when such acts or omissions are within such teacher's scope of employment and are taken in good faith in the course of supervision, care or discipline of students, unless such acts or omissions were the result of gross negligence or willful misconduct.
>
> B. No school employee or school volunteer shall be liable for any civil damages arising from the prompt good faith reporting of alleged acts of

19

bullying or crimes against others to the appropriate school official in compliance with specified procedures.

Burns maintains that he is entitled to immunity from Gagnon's simple negligence claim under both of these subsections. We address them in turn.

1.

Burns argues that he is immune under subsection (A) because Gagnon's simple negligence claim arises out of acts or omissions relating to the "supervision, care or discipline of students" within the scope of Burns' employment. Code § 8.01-220.1:2(A). Burns acknowledges that subsection (A) speaks only of "[a]ny teacher," id., but argues that, under this Court's decision in Tazewell County School Board v. Brown, 267 Va. 150, 162, 591 S.E.2d 671, 677 (2004), "teacher" includes principals. Hence, he concludes, principals, too, are shielded from liability under subsection (A).

We disagree. By its terms, subsection (A) applies only to "[a]ny teacher." Code § 8.01-220.1:2(A). Because "teacher" is not defined in Code § 8.01-220.1:2, we must accord the term its "ordinary meaning." James v. City of Falls Church, 280 Va. 31, 43, 694 S.E.2d 568, 575 (2010); see also Hubbard v. Henrico Ltd. P'ship, 255 Va. 335, 340, 497 S.E.2d 335, 338 (1998) ("When . . . a statute contains no express definition of a term, the general rule of statutory construction is to infer

20

the legislature's intent from the plain meaning of the language used.").  A "teacher" is defined as "one whose occupation is to instruct."  Webster's Third New International Dictionary 2346 (1993).

Burns' reliance on Brown to argue that, for purposes of subsection (A), "teacher" also includes principals – i.e., those whose occupation is to lead educational institutions, id. at 1802 – is misplaced.  In that case, we considered, among other things, whether "teacher" includes "the position of principal" for purposes of Part III of the State Grievance Procedure.  Brown, 267 Va. at 162, 591 S.E.2d at 677.  And we held that it did.  Id. at 164, 591 S.E.2d at 678.

In reaching that result, we first noted that "teacher" was not defined anywhere in Part III.  Id. at 162, 591 S.E.2d at 677.  We then observed that the term had been defined by the Board of Education, in accordance with its rule-making authority:  "The definition of the term 'teacher' for purposes of Part III . . . includes 'all regularly certified/licensed professional public school personnel employed under a written contract . . . as a teacher or supervisor of classroom teachers."  Id. (second alteration in original; citation omitted).  Because a principal is required to hold a license and because a principal is a supervisor of classroom teachers, we reasoned that a principal fell under the definition of

21

"teacher" for purposes of Part III.  Id. at 162-63, 591 S.E.2d at 677.

Brown's definition of "teacher" has no application here. As just explained, Brown dealt with a grievance procedure that was promulgated and construed by a State agency.  This case, in contrast, involves an immunity provision enacted by the General Assembly.  In interpreting that provision, we cannot put a construction upon the plain and definite words chosen that "amounts to holding the legislature did not mean what it has actually expressed."  Id. at 162, 591 S.E.2d at 677.  In other words, we " 'cannot change or amend a statute under the guise of construing it.' "  Id. (quoting Coca-Cola Bottling Co. of Roanoke, Inc. v. County of Botetourt, 259 Va. 559, 565, 526 S.E.2d 746, 750 (2000)).  For purposes of subsection (A), then, we define "teacher" according to its ordinary meaning, and not according to the meaning we adopted in Brown and urged by Burns.

Applying that ordinary meaning in this case, we think it plain that Burns is not a "teacher" under subsection (A).  His occupation is not to instruct at an educational institution, see Webster's, at 2346; rather, his occupation is to lead an educational institution.  See id. at 1802.  We thus conclude that subsection (A) affords Burns no immunity from Gagnon's simple negligence claim.

## 2.

Burns contends that he is also immune under subsection (B), because, according to him, Gagnon's simple negligence claim arises out of the "good faith reporting of alleged acts of bullying or crimes against others to the appropriate school official in compliance with specified procedures."  Code § 8.01-220.1:2(B).  We find this argument without merit.  Burns was not sued because he reported an alleged act of bullying or crime against another to the appropriate school official; rather, he was sued because he failed to respond to such a report.  We accordingly hold that Burns is not entitled to immunity from Gagnon's simple negligence claim under subsection (B).

## 3.

Since neither subsection (A) nor subsection (B) of Code § 8.01-220.1:2 applies in this case, we conclude that the circuit court did not err in holding that Burns was not immune from Gagnon's simple negligence claim under the statute.

## B.

Burns further argues that the common law affords him immunity from Gagnon's simple negligence claim.  "This Court has outlined a four-factor test for determining whether an individual working for an immune governmental entity . . . is entitled to the protection of sovereign immunity."  Friday-

Spivey v. Collier, 268 Va. 384, 387-88, 601 S.E.2d 591, 593 (2004). See also Messina, 228 Va. at 312-13, 321 S.E.2d at 663-64; James, 221 Va. at 53, 282 S.E.2d at 869. Those factors are: "(1) the nature of the function the employee performs; (2) the extent of the governmental entity's interest and involvement in the function; (3) the degree of control and direction exercised by the governmental entity over the employee; and (4) whether the alleged wrongful act involved the exercise of judgment and discretion." Lentz v. Morris, 236 Va. 78, 82, 372 S.E.2d 608, 610 (1988). Burns and Gagnon, as the circuit court noted, disagree only over whether the fourth factor is satisfied. We agree with Burns that it is.

Burns contends that this case is on all fours with Banks v. Sellers, 224 Va. 168, 294 S.E.2d 862 (1982). There we held, among other things, that a high school principal is entitled to immunity because he "performs a large number of discretional and managerial functions in the school." Id. at 173, 294 S.E.2d at 865. Other than this oblique reference to the discretionary nature of a number of the functions performed by a principal, however, the Court did not discuss the application of the governing four-factor immunity test in holding the principal immune. See id. Thus, Banks is not dispositive here.

24

More recently, in Lentz, we considered whether a schoolteacher's "supervision and control" of a physical education class involved judgment and discretion. 236 Va. at 83, 372 S.E.2d at 610. We concluded that it did, reasoning: "[A] teacher's supervision and control of a physical education class, including the decision of what equipment and attire is to be worn by the student participating, clearly involves, at least in part, the exercise of judgment and discretion by the teacher." Id., 372 S.E.2d at 611. We accordingly held that the schoolteacher was entitled to immunity. Id.

Like the schoolteacher's supervision and control of his physical education class in Lentz, Burns' response (or lack thereof) to Diaz' report involved the exercise of judgment and discretion. Upon receiving Diaz' report, Burns had to make several decisions. To start, Burns had to decide whether to respond at all. Diaz had misled Burns and Beverage that morning about an unrelated disciplinary offense, so there was reason to doubt the report's veracity. Next, Burns had to decide when to respond. While Diaz said that the fight would occur sometime that day, he did not provide Burns with a specific time; thus, there was no reason to think that an immediate response was required. And finally, Burns had to decide how to respond. Diaz did not reveal the identity of the other student who would be involved in the fight or say where

25

the fight would occur, so the type of response needed was not readily apparent.

In light of these decisions that Burns had to make upon receiving Diaz' report, we conclude that his response (or lack thereof) was not simply a ministerial act; instead, it was an act involving the exercise of judgment and discretion. The circuit court therefore erred in holding that Burns was not entitled to common-law immunity from Gagnon's simple negligence claim.

IV.

If an individual working for an immune governmental entity is entitled to the protection of sovereign immunity under the common law, he is not immunized from suit. Colby v. Boyden, 241 Va. 125, 128, 400 S.E.2d 184, 186 (1991). "Rather, the degree of negligence which must be shown to impose liability is elevated from simple to gross negligence." Id. Here the circuit court refused to give the jury a gross negligence instruction, relying on its prior holding at the plea in bar stage that Burns' acts or omissions did not amount to gross negligence. Gagnon asserts that this ruling was in error. We agree.

"A litigant is entitled to jury instructions supporting his theory of the case if sufficient evidence is introduced to support that theory." Price v. Taylor, 251 Va. 82, 85, 466

26

S.E.2d 87, 88 (1996); see also Bowers v. May, 233 Va. 411, 413-14, 357 S.E.2d 29, 30 (1987).  "It is immaterial that the jury could have reached contrary conclusions.  If a proffered instruction finds any support in credible evidence, its refusal is reversible error."  McClung v. Commonwealth, 215 Va. 654, 657, 212 S.E.2d 290, 293 (1975).  In this case, then, the circuit court was required to instruct the jury on gross negligence unless the evidence was " 'clearly insufficient to support [that] theory.' "  Price, 251 Va. at 85, 466 S.E.2d at 89 (quoting Provident Life & Accident Ins. Co. v. Walker, 190 Va. 1016, 1028, 59 S.E.2d 126, 131 (1950)).

"[G]ross negligence," we recently reiterated, is "the utter disregard of prudence amounting to complete neglect of the safety of another.  It is a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care."  Volpe v. City of Lexington, 281 Va. 630, 639, 708 S.E.2d 824, 829 (2011) (quoting Chapman v. City of Virginia Beach, 252 Va. 186, 190, 475 S.E.2d 798, 800-01 (1996)).  "Ordinarily, the question whether gross negligence has been established is a matter of fact to be decided by a jury."  Frazier v. City of Norfolk, 234 Va. 388, 393, 362 S.E.2d 688, 691 (1987).

27

Viewing the evidence in the light most favorable to Gagnon, we believe that it was sufficient to submit the question whether Burns was grossly negligent to the jury. Diaz told Burns on the morning of the fight that, according to messages sent through MySpace, Gagnon "was going to get into a fight" sometime that day. Upon receiving Diaz' report, Burns wrote down Gagnon's name and said that he would "alert security," that "he would look into it," and that he would "take care of it." In our view, the fact that Burns did not respond to Diaz' report – or at least did not respond in time to stop the fight – could possibly lead a jury to conclude that he acted in "utter disregard of prudence amounting to a complete neglect of [Gagnon's] safety," and thus was grossly negligent. Koffman v. Garnett, 265 Va. 12, 15, 574 S.E.2d 258, 260 (2003) (quoting Ferguson v. Ferguson, 212 Va. 86, 92, 181 S.E.2d 648, 653 (1971)). We thus hold that the circuit court erred in refusing to instruct the jury on gross negligence.

V.

We finally turn to Diaz' deposition. Burns challenged its admissibility both at the plea in bar hearing and at trial. Although we remand this case for a new trial, we nonetheless address the objections that Burns made at both stages of the case because they may arise again on retrial. See Dandridge v. Marshall, 267 Va. 591, 595, 594 S.E.2d 578, 581 (2004).

28

Burns first argues, as he did at both the plea in bar hearing and trial, that Diaz' deposition was inadmissible under Rule 4:7, because Diaz' unavailability was not proved by Gagnon or found by the circuit court, and because the deposition was taken in a previous action involving different parties.  We disagree.

We review a circuit court's decision to admit the deposition of an absent witness under Rule 4:7 for an abuse of discretion.  <u>Greater Richmond Transit Co. v. Massey</u>, 268 Va. 354, 357, 601 S.E.2d 609, 611 (2004).  That Rule, as relevant here, provides:

> (4) The deposition of a witness, whether or not a party, may be used by any party for any purpose in any action upon a claim arising at law . . . if the court finds: . . . (B) that the witness is at a greater distance than 100 miles from the place of trial or hearing, or is out of this Commonwealth, unless it appears that the absence of the witness was procured by the party offering the deposition . . . .

> . . . .

> (7) In any action, the fact that a deposition has not been offered in evidence prior to an interlocutory decree or order shall not prevent its thereafter being so offered except as to matters ruled upon in such interlocutory decree or order; provided, however, that such deposition may be read as to matters ruled upon in such an interlocutory decree or order if the principles applicable to after-discovered evidence would permit its introduction.

> Substitution of parties does not affect the right to use depositions previously taken; and when there are pending in the same court several actions or suits between the same parties, depending upon the same

29

facts, or involving the same matter of controversy, in whole or in part, a deposition taken in one of such actions or suits, upon notice to the same party or parties, may be read in all, so far as it is applicable and relevant to the issue; and, when an action in any court of the United States or of this or any other state has been dismissed and another action involving the same subject matter is afterward brought between the same parties or their representatives or successors in interest, all depositions lawfully taken and duly filed in the one action may be used in the other as if originally taken therefor.

Diaz' deposition was admissible under these subsections if (1) he was more than "100 miles from the place of [the] trial or hearing, or [was] out of this Commonwealth"; (2) it was taken in a previous "action involving the same subject matter" as the present action; and (3) the present action is "between the same parties" as the previous action. We conclude that all of these conditions were met. First, the evidence showed, and Burns did not challenge, that Diaz was on active military duty in Georgia, which is both more than "100 miles from the place of [the] trial and hearing" and "out of this Commonwealth." Second, this action "involv[es] the same subject matter" as the action in which the deposition was taken — namely, the fight between Newsome and Gagnon. Third, this action is between Gagnon and Burns and so was the action in which the deposition was taken; it did not matter that the other parties changed.

We accordingly hold that the circuit court did not abuse its discretion in admitting Diaz' deposition at the plea in bar

30

hearing or at trial, pursuant to Rule 4:7.  Of course, if Burns wishes to introduce any portion of the deposition on retrial, Diaz' unavailability will again have to be established in accordance with Rule 4:7's requirements.

Burns also contends that numerous statements in the portions of Diaz' deposition that were admitted at both the plea in bar hearing and trial should have been excluded by the circuit court because they contained inadmissible hearsay. Specifically, Burns points to Diaz' "substantive references" to an affidavit that Diaz executed some months after the fight, which detailed, among other things, his interactions with Burns before and after the fight.  In one admitted portion of the deposition, Diaz "dr[ew] a blank" when asked by Gagnon's counsel whether Burns said "[a]nything else . . . about what he could have done," so Diaz reviewed the affidavit.  The following colloquy then occurred:

> [Gagnon's counsel]:  Let the record reflect you're looking through your affidavit on that.
>
> By [Gagnon's counsel]:
>
> Q.  What page are you on?
>
> A.  The last, third page.
>
> Q.  Okay.
>
> A.  I wish he [Burns] would have done something.
>
> Q.  That's what you said to him?

31

A. That is what I said to him.

Q. That's what your affidavit says?

A. That is what my affidavit says.

Q. Is that affidavit correct?

A. It's a hundred percent correct.

We will not overturn a circuit court's decision to admit or exclude evidence unless the court abused its discretion. Gray v. Rhoads, 268 Va. 81, 86, 597 S.E.2d 93, 96 (2004). Here we cannot say that the circuit court abused its discretion in admitting the above-quoted portion or any of the other portions of Diaz' deposition in which the affidavit is mentioned at either the plea in bar hearing or trial.

We have long upheld the use of written materials to refresh a witness's recollection. As we recently explained:

> [W]hen a witness has a memory lapse on the stand and forgets some portion (or even all) of the facts of the matter about which [he or she is] called to testify, a party may attempt to "refresh" the witness's memory by having the witness examine materials relating to the matter for which they are testifying. After examining such materials, a witness may then speak to the facts from his own recollection.

Ruhlin v. Samaan, 282 Va. 371, 379, 718 S.E.2d 447, 451 (2011) (second alteration in original; some internal quotation marks and citation omitted).

In this case, we think it clear that Diaz' examination of the affidavit was for the sole purpose of refreshing his

32

recollection about what occurred between him and Burns after the fight. It is equally clear that Diaz' review of the affidavit did refresh his recollection, as he avers that his statement, "I wish he [Burns] would have done something," was "a hundred percent correct." Although it may have been improper for Gagnon's counsel to ask Diaz if his answer was as stated in the affidavit and for the circuit court not to redact that portion of the deposition, Diaz did have an independent recollection of the events, and his testimony was not hearsay.

In the other admitted portions of the deposition in which the affidavit is mentioned, Diaz merely confirms that he executed one and explains that he waited several months to do so because he was afraid of retribution by the school. Also, he acknowledges that he reviewed the affidavit in preparation for the deposition and, when asked by Gagnon's counsel whether, "[a]part from the affidavit, [he] still ha[s] an independent recollection of what happened [on the day of the fight]," Diaz answers, "Yes, I do." We do not believe that any of these references to the affidavit by Diaz or Gagnon's counsel presented a hearsay problem.

Burns further claims that the admitted portions of Diaz' deposition contained four other statements that should have been excluded by the circuit court as inadmissible hearsay. He did not, however, object to those statements on hearsay grounds

33

at the plea in bar hearing.  And for purposes of trial, he only objected to three of them as inadmissible hearsay.  We thus only consider whether the circuit court abused its discretion in admitting those three statements into evidence at trial.

In the first statement, Diaz testified that he waited until June 2007 to execute the affidavit because he was afraid "of retribution" "[b]y the school about this particular incident."  This statement was not hearsay, since it was made by Diaz while he was testifying under oath during his deposition – which, pursuant to Rule 4:7, is treated as live, in-person testimony.  Horne v. Milgrim, 226 Va. 133, 138, 306 S.E.2d 893, 895 (1983) (stating that deposition testimony admitted into evidence under rule 4:7 "as substantive proof is oral testimony, not an exhibit"); Stevenson v. Commonwealth, 218 Va. 462, 465, 237 S.E.2d 779, 781 (1977) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." (quoting Unif. R. Evid. 801(c)).

In the second statement, Diaz testified that he informed a hall monitor after the fight that he had "told Vice Principal Burns about this already.  And she was like, let's go talk to Dr. Beverage."  This statement was not hearsay because it was not offered to prove the truth of what the hall monitor said.

34

_Id._  Rather, it was introduced to show the actions Diaz took following the fight.

And in the third statement, Diaz testified that he told Beverage that Burns had said that "he was going to get security on it before the fight."  Although this statement was hearsay, it was admissible under the party-admission exception to the rule against hearsay.  Goins v. Commonwealth, 251 Va. 442, 461, 470 S.E.2d 114, 127 (1996) ("A statement made by a party is admissible in evidence against him.").

Since these three statements were either not hearsay or admissible under a well-established exception to the rule against hearsay, we hold that the circuit court did not abuse its discretion in admitting them into evidence with the other portions of Diaz' deposition.

## VI.

Because the circuit court erred by holding that Burns is not entitled to the protection of sovereign immunity under the common law and by refusing Gagnon's proffered jury instruction on gross negligence, we reverse in part and remand the case to the circuit court for a new trial limited to Gagnon's gross negligence claim against Burns.  In light of this decision, we do not reach the question raised by Gagnon's cross-appeal, namely, whether intentional and negligent tortfeasors can be held jointly and severally liable.

35

Record No. 110754 – <u>Affirmed in part, reversed in part, and remanded.</u>

Record No. 110767 – <u>Dismissed.</u>

JUSTICE MIMS, concurring in part and dissenting in part.

I agree with most of the majority opinion. However, I disagree with its determination that Burns is immune under the common-law doctrine of sovereign immunity and thus I must dissent from Part III(B) and would not reach the issue of the gross negligence jury instruction considered in Part IV.

The majority determines that the fourth prong of the test for sovereign immunity applied in <u>Lentz v. Morris</u>, 236 Va. 78, 82, 372 S.E.2d 608, 610 (1988), is met because Burns had to decide whether, when, and how to respond to Diaz's warning. It therefore concludes that his failure to notify the school's security personnel about the danger involved the exercise of judgment and discretion, and consequently was not simply a ministerial act. However, in my view, Burns' statement to Diaz that he would "alert [his] security and we'll make sure this problem gets taken care of" reflects that he had already exercised his discretion and decided whether and how to respond. All that remained was to put the course of action he had decided upon into execution. Consequently, the discretionary portion of his response had been fully discharged

36

and his failure to execute the decision he had made was as much a failure to perform a ministerial act as if he had delegated it to a subordinate who thereafter disobeyed his order.

I acknowledge that under ordinary circumstances an official's discretion may include not only the capacity to make a decision in the first instance but also to change his mind and make a new, even contradictory decision, at a later time. But there is no evidence in this case that Burns first decided to alert security and subsequently changed his mind.  Moreover, Burns' statement assured Diaz that "this problem [would be] taken care of," thereby potentially deterring the student from warning other administrators who might have decided, as Burns did, to alert security but who actually would have followed through on that decision as well.

I therefore believe that Burns' failure to notify security was the failure to perform a ministerial act and would hold that the test for sovereign immunity was not met. Consequently, the jury need not have decided whether Burns' inaction was gross negligence and the circuit court was not obliged to instruct them on it.