PRESENT: Kinser, C.J., Lemons, Goodwyn, Millette, and Powell, JJ., and Russell and Lacy, S.JJ.

COMMONWEALTH OF VIRGINIA

OPINION BY
v.  Record No. 121717          JUSTICE CLEO E. POWELL
                                   October 31, 2013
GRAFTON WILLIAM PETERSON,
ADMINISTRATOR OF THE ESTATE OF
ERIN NICOLE PETERSON, DECEASED, ET AL.,

FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
William N. Alexander, II, Judge Designate

This appeal arises out of wrongful death suits filed against the Commonwealth by the administrators (hereinafter "Administrators") of the estates of Erin Nicole Peterson and Julia Kathleen Pryde, two murder victims of the tragic 2007 mass shooting at Virginia Polytechnic Institute and State University (hereinafter "Virginia Tech").[1]  In this case, we hold that even if there was a special relationship between the Commonwealth and students of Virginia Tech, under the facts of this case, there was no duty for the Commonwealth to warn students about the potential for criminal acts by third parties.  Therefore, we will reverse the judgment of the circuit court.

I. FACTS AND PROCEEDINGS

---

[1] In a separate appeal this day decided, Record No. 121720, the Administrators appeal the trial court's decision to grant a plea of res judicata and motion to dismiss filed by Charles W. Steger, the President of Virginia Tech.  The trial court denied the Commonwealth's same motion and Peterson and Pryde's wrongful death suits were consolidated and proceeded to a jury trial against the Commonwealth only.

On the morning of April 16, 2007, at approximately 7:30 a.m., the Virginia Tech Police Department received a call that an incident had occurred in the West Ambler Johnston Hall dormitory but the specifics of what had happened were unknown. When officers arrived they found two gunshot victims: a female and a male clad in only his boxer shorts. Although officers from the Virginia Tech Police Department were the first on the scene, the Blacksburg Police Department led the investigation. At least one member of the Virginia State Police also joined the investigation.

During the investigation, police came to believe that they were investigating a domestic homicide because there were no signs of forced entry or a robbery. They believed that a "targeted shooting" had occurred because the shooting was in a "less conspicuous area . . . kind of hidden in the back"[2] making it "easier for the suspect to get in and get out without being noticed." Police believed that this was an isolated incident that posed no danger to others and that the shooter had fled the area. They did not believe that a campus lockdown was necessary.

At the crime scene, police observed a bloody footprint and were determined to locate the source of the print. Police also

---

[2] The officers described the area as being one that you would not even know was there if you did not live there.

learned that the female's boyfriend was a gun enthusiast.

Once the female's boyfriend was identified as a person of interest, a "Be On The Lookout" ("BOLO") went out for him. The police located the boyfriend at approximately 9:45 a.m. Officers described him as appearing "[s]hocked" and "[s]cared." The boyfriend told the police that he was en route to Virginia Tech from Radford University where he attended school because, while he was in his 9 a.m. class, he heard from a friend who attended Virginia Tech who told him what had happened. He explained that he had dropped his girlfriend off that morning around 7 a.m. and then headed to Radford University for his 8 a.m. class. The boyfriend consented to a search of his vehicle and shoes. He also allowed the police to conduct a gunshot residue test. As police spoke with the boyfriend, they received word that there were "active shots" in Norris Hall. Officers quickly took the boyfriend's contact information, told him that they would be in touch, and left for the Virginia Tech campus.

Police subsequently executed a search warrant of the home of the boyfriend of the female victim found in West Ambler Johnston Hall. They found nothing.

Charles W. Steger, the President of Virginia Tech, testified that he learned of "a shooting" at approximately 8 a.m. and he called a meeting of a group of administrators tasked with campus safety, called the University Policy Group

(hereinafter "Policy Group"), to assess the situation and handle the release of information pertaining thereto.  Shortly after 8 a.m., President Steger spoke with Wendell Flinchum, the Chief of the Virginia Tech Police Department, and learned that a female and a male student had been shot, at least one of whom was dead, that the shootings appeared targeted, likely domestic in nature, and that the shooter had likely left the campus.

The Policy Group convened around 8:30 a.m.  During this meeting, Steger learned that the police were on the lookout for the female victim's boyfriend as a person of interest.  One of the group's members, Ralph Byers, the Executive Director for Government Relations, notified the Governor's Office at approximately 8:45 a.m. of what had happened in West Ambler Johnston Hall but indicated that the information was not releasable because Virginia Tech was working on a press release. The email to the Governor's office stated "Not releaseable yet. One student dead, one wounded.  Gunman on loose. . . .  State police are involved.  No details available yet."  Byers claimed that he used the phrase "[g]unman on the loose" as shorthand for the "perpetrator has not been apprehended."  Virginia Tech wanted to notify the next of kin before releasing the information to the public.  Steger instructed a Policy Group member to compose a campus notice, and following revisions and a technical difficulty with the computer system, it was sent out

4

by campus-wide "blast e-mail" at 9:26 a.m.  The notice stated that "[a] shooting incident occurred at West Ambler Johnston [Hall] earlier this morning.  Police are on the scene and investigating" and advised students to be alert for anything suspicious.  At 9:28 a.m. the Policy Group also sent a message to the Board of Visitors stating "[t]wo students were shot this morning, one fatally.  We will be back in touch with more information as soon as it is known.  Please do NOT release the information about the fatality."

At approximately 9:45 a.m. the mass shooting at Norris Hall began.  At 9:50 a.m. a second campus-wide "blast e-mail" was sent stating that "[a] gunman is loose on campus.  Stay in buildings until further notice.  Stay away from all windows."  Erin Peterson, 18, and Julia Pryde, 23, were among the victims murdered in Norris Hall.  Police later identified Seung-Hui Cho as the shooter.

After the Norris Hall shooting, police realized that the patterns on shoes worn by Cho did not match the prints found in West Ambler Johnston Hall.  The day after the shootings, police learned that the gun used to murder the two people in West Ambler Johnston Hall matched the one Cho used in Norris Hall.  Police later found bloody clothing belonging to Cho that had the DNA from one of the victims of the West Ambler Johnston Hall shooting on it.

The Administrators filed wrongful death claims in Montgomery County Circuit Court against Cho's estate, the Commonwealth and eighteen other individuals, including Steger. The cases were consolidated, but following certain non-suits and pretrial orders (see companion appeal Peterson v. Commonwealth, Record No. 121720) the Commonwealth was the sole defendant at trial. The Administrators claimed that the Commonwealth was liable for the actions of the Commonwealth's employees at the university pursuant to the Virginia Tort Claims Act ("VTCA"), Code § 8.01-195.1, et seq. They alleged that a special relationship existed between the Commonwealth's employees at Virginia Tech and Peterson and Pryde that gave rise to the Commonwealth's duty to warn Peterson and Pryde of third party criminal acts and that the Commonwealth's failure to warn them was the proximate cause of their deaths and the Administrators' losses. The Commonwealth argued that there was no foreseeable harm to the students and that the evidence failed to establish that any alleged breach of a duty of care was the proximate cause of the deaths.

The Commonwealth objected to several jury instructions, including Instruction 3 which provided, in summary, that Peterson and Pryde were business invitees of Virginia Tech and enjoyed a special relationship with the university. The instruction further stated that this status imposed a duty on

6

the university employees to maintain a safe campus. Based on this instruction, the jury was told that if they found that the university employees should have reasonably foreseen that injury arising from the criminal conduct of a third party might occur but failed to warn students, the Commonwealth should be found negligent. The instruction also stated that the jury should find in favor of the Administrators if that failure to warn was the proximate cause of the alleged injuries. The jury returned a verdict in favor of the Administrators awarding $4 million to each family.

Upon the Commonwealth's motion, the court reduced each verdict to $100,000 in accordance with the VTCA, Code § 8.01-195.3. The Commonwealth moved to set aside the jury verdict arguing it was contrary to well-established Virginia law that a special relationship does not exist under the circumstances here, citing Burns v. Gagnon, 283 Va. 657, 668, 727 S.E.2d 634, 641 (2012), which was decided post-trial. The Commonwealth again argued that the verdict should be set aside because the evidence was insufficient as a matter of law to give rise to a duty to protect from third party criminal acts. Alternatively, the Commonwealth argued that the trial court should order a new trial due to erroneous jury instructions. The trial court denied these motions. This appeal follows.

II. ANALYSIS

7

On appeal, the Commonwealth argues that

> 1.  The circuit court erred in finding that the Commonwealth, Virginia Tech, and/or their employees had a special relationship with Peterson and Pryde that imposed a duty, and therefore, erred in instructing the jury that there was such a duty, in submitting the case to the jury and in entering judgment on the jury's verdict.
>
> 2.  Even assuming that the Commonwealth, Virginia Tech or their employees had a relevant special relationship under Virginia law, the evidence adduced did not give rise to a duty to warn of third party criminal acts, and therefore, the circuit court erred in submitting the case to the jury and in entering judgment on the jury's verdict.
>
> 3.  The circuit court erred in finding that there was sufficient evidence regarding causation to raise a jury issue, and therefore, erred in submitting the case to the jury and in entering judgment on the jury's verdict.
>
> 4.  Even if there were a theory that might have allowed plaintiffs to recover, the circuit court's instructions (2, 3, 4, 10 & 11) misstated Virginia law regarding the existence of a relevant special relationship, the existence and type of duty purportedly owed, the standard that triggers a duty to warn of third party criminal acts, as well as regarding the reasonable expectation of parents and students at a university, and therefore, the jury's verdict must be overturned.

We hold that the facts in this case do not give rise to a duty for the Commonwealth to warn students of the potential for third party criminal acts.  Therefore, we do not reach the Commonwealth's causation or jury instruction arguments.

8

As a general rule, a person does not have a duty to warn or protect another from the criminal acts of a third person. Thompson v. Skate America, Inc., 261 Va. 121, 128-29, 540 S.E.2d 123, 127 (2001). "This is particularly so when the third person commits acts of assaultive criminal behavior because such acts cannot reasonably be foreseen." Burdette v. Marks, 244 Va. 309, 311-12, 421 S.E.2d 419, 420 (1992). However, the general rule does not apply in all situations. "'There are narrow exceptions to this rule,' but the application of those exceptions 'is always fact specific and, thus, not amenable to a bright-line rule for resolution.'" Taboada v. Daly Seven, Inc., 271 Va. 313, 322-23, 626 S.E.2d 428, 432 (2006) (alteration omitted) (quoting Yuzefovsky v. St. John's Wood Apartments, 261 Va. 97, 106, 540 S.E.2d 134, 139 (2001)), aff'd on reh'g, 273 Va. 269, 270, 641 S.E.2d 68, 68 (2007). Before an exception comes into play, the facts must establish the existence of a special relationship.

"'[W]hether a legal duty in tort exists is a pure question of law'" to be reviewed de novo. Gagnon, 283 Va. at 668, 727 S.E.2d at 642 (quoting Kellermann v. McDonough, 278 Va. 478, 487, 684 S.E.2d 786, 790 (2009). To prevail,

> the plaintiff must establish that there is a
> special relationship, either between the
> plaintiff and the defendant or between the
> third party criminal actor and the
> defendant. The necessary special

9

>relationship may be one that has been
>recognized as a matter of law . . . or it
>may arise from the factual circumstances of
>a particular case.

Yuzefovsky, 261 Va. at 107, 540 S.E.2d at 139 (citation and footnote omitted).  For the purposes of this opinion, we will assume without deciding that the threshold requirement that such a special relationship exists is satisfied on these facts.

Having assumed without deciding that a special relationship exists, the question becomes whether, as a matter of law, under the facts and circumstances of this case, the Commonwealth had a duty to warn students about the potential for third party criminal acts.  "The law determines the duty, and the jury, upon the evidence, determines whether the duty has been performed." Acme Markets, Inc. v. Remschel, 181 Va. 171, 178, 24 S.E.2d 430, 434 (1943).

A review of our prior cases indicates that in order for a duty to be imposed upon a defendant, the degree of the foreseeability of harm that the plaintiff must establish depends on the nature of the special relationship.  We have recognized two levels of foreseeable harm: known or reasonably foreseeable harm, Taboada, 271 Va. at 325-26, 626 S.E.2d at 434, and "imminent probability of harm," the heightened degree of foreseeability that arises where the defendant "knows that criminal assaults against persons are occurring, or are about to

10

occur, on the premises," based upon "notice of a specific danger just prior to the assault." Thompson, 261 Va. at 128-29, 540 S.E.2d at 127 (citing Wright v. Webb, 234 Va. 527, 533, 362 S.E.2d 919, 922 (1987)). Certain special relationships such as that of a common carrier/passenger, innkeeper/guest, and employer/employee impose a duty to warn when the danger of third party criminal acts is known or reasonably foreseeable. See Taboada, 271 Va. at 325-26, 626 S.E.2d at 434 (innkeeper/guest); A.H. v. Rockingham Publishing Co., Inc., 255 Va. 216, 221, 495 S.E.2d 482, 486 (1998)(employer/employee); Connell v. Chesapeake & Ohio Ry. Co., 93 Va. 44, 62, 24 S.E. 467, 470 (1896)(common carrier/passenger).

In instances, however, where the special relationship was that of business owner/invitee or landlord/tenant, we have imposed a duty to warn of third party criminal acts only where there was "an imminent probability of injury" from a third party criminal act. Yuzefovsky, 261 Va. at 109, 540 S.E.2d at 141.[3]

---

[3] In this case, the circuit court instructed the jury that there was a business owner/invitee relationship between the Commonwealth and the students and that there was a duty to warn if the danger was reasonably foreseeable. This was error because our case law is clear that when the relationship is that of business owner/invitee, the duty to warn arises only if there is an imminent probability of harm from a third party criminal act. However, because we conclude that, under the facts of this case, no duty was established under the more lenient standard of foreseeability, this distinction is not dispositive in the resolution of this appeal.

11

Thus, the duty to warn of danger from third party criminal acts has remained an exception to the general rule. Burdette, 244 Va. at 312-13, 421 S.E.2d at 421.

Where the standard was that the duty to warn or protect was present when there was "an imminent probability of injury" from a third party criminal act, this Court has held that the duty to warn existed, as a matter of law, in the unusual situation where an on-duty police officer failed to intervene when he responded to the scene of a motor vehicle accident and observed one driver attack a bystander who had stopped to render assistance. Id. at 310-11, 421 S.E.2d at 419-20. More frequently, however, this Court has concluded that facts relied upon in particular cases fail to establish a duty, as a matter of law, to protect against third party criminal acts. See, e.g., Dudas v. Glenwood Golf Club, Inc., 261 Va. 133, 140, 540 S.E.2d 129, 133 (2001) (holding that two robberies within the month preceding the attack on plaintiff was not a "level of criminal activity" that would "have led a reasonable business owner to conclude that its invitees were in imminent danger of criminal assault"); Yuzefovsky, 261 Va. at 109, 540 S.E.2d at 141 (concluding as a matter of law that employee misrepresentations about the safety of an apartment complex, where in one year 656 crimes, including 113 against persons, had been reported, failed to give rise to the duty to warn or protect from harm because these facts failed

12

to establish "an imminent probability of injury to [the plaintiff] from a" criminal act of a third party); Burns v. Johnson, 250 Va. 41, 42-45, 458 S.E.2d 448, 449-52 (1995) (trial court erred as a matter of law in failing to hold that the fifteen minutes between an individual making sexual advances to a store clerk and abducting and raping a store patron did not give rise to the duty to protect against third party criminal acts).

In cases where it was alleged that a special relationship gave rise to the duty to warn because the danger of harm from third party criminal acts was known or reasonably foreseeable, this Court has similarly, frequently concluded that the duty to warn was not present as a matter of law. See A.H., 255 Va. at 221-22, 495 S.E.2d at 486 (stating that an employer has no duty to protect an employee from third party criminal acts unless the danger is "known or reasonably foreseeable" as a matter of law and concluding that knowledge of similar assaults in the preceding five years was not sufficient); Connell, 93 Va. at 58, 24 S.E. at 469 (common carrier "cannot be deemed to have anticipated nor be expected to guard and protect [a passenger] against a crime so horrid, and happily so rare, as that of murder.").

In only rare circumstances has this Court determined that the duty to protect against harm from third party criminal acts

exists.  See Taboada, 271 Va. at 325-26, 626 S.E.2d at 434 (concluding that, like a common carrier, an innkeeper has a "duty of utmost care and diligence" to protect guests from third party criminal acts where the danger is known or reasonably foreseeable, and holding that where -- over a three year period immediately prior to the attack -- hotel employees had called police 96 times to report criminal conduct including robberies, malicious woundings, shootings, and other criminally assaultive acts, the hotel knew of the danger and had received a warning from police that "guests were at a specific imminent risk of harm," these were sufficient averments to survive a demurrer and, if proven, to establish the duty as a matter of law).

Here, even if this Court were to apply the less stringent standard of "know or have reasonably foreseen," there simply are not sufficient facts from which this Court could conclude that the duty to protect students against third party criminal acts arose as a matter of law.  In this case, the Commonwealth knew that there had been a shooting in a dormitory in which one student was critically wounded and one was murdered.  The Commonwealth also knew that the shooter had not been apprehended.  At that time, the Commonwealth did not know who the shooter was, as law enforcement was in the early stages of its investigation of the crime.  However, based on representations from three different police departments,

14

Virginia Tech officials believed that the shooting was a domestic incident and that the shooter may have been the boyfriend of one of the victims. Most importantly, based on the information available at that time, the defendants believed that the shooter had fled the area and posed no danger to others. This is markedly different from the situation presented in Taboada, 271 Va. at 325-26, 626 S.E.2d at 434, where police had specifically warned the innkeepers that guests were at risk prior to the time that the plaintiff in that case was shot by a trespasser. Based on the limited information available to the Commonwealth prior to the shootings in Norris Hall, it cannot be said that it was known or reasonably foreseeable that students in Norris Hall would fall victim to criminal harm. Thus, as a matter of law, the Commonwealth did not have a duty to protect students against third party criminal acts.

### III. CONCLUSION

Assuming without deciding that a special relationship existed between the Commonwealth and Virginia Tech students, based on the specific facts of this case, as a matter of law, no duty to warn students of harm by a third party criminal arose. Thus, we will reverse the trial court's judgment holding that a duty arose and enter final judgment in favor of the Commonwealth.

<u>Reversed and final judgment.</u>