PRESENT: All the Justices

CAROLYN McBRIDE, AS
ADMINISTRATOR OF THE ESTATE OF
DONNELL EARL WORSLEY, DECEASED

OPINION BY
JUSTICE CLEO E. POWELL

v.  Record No. 131301
OCTOBER 31, 2014

JOEY GAYLAN BENNETT, JR.,
INDIVIDUALLY AND AS AN EMPLOYEE
OF THE CITY OF NORFOLK, ET AL.

FROM THE CIRCUIT COURT FOR THE CITY OF NORFOLK
Jerrauld C. Jones, Judge

Carolyn McBride ("McBride"), the administrator for the
estate of Donnell Worsley ("Worsley"), appeals the trial court's
judgment that sovereign immunity bars her wrongful death action
against Joey Gaylan Bennett, Jr. ("Bennett") and Derek Michael
Folston ("Folston").

I.  BACKGROUND

On July 25, 2010, Bennett and Folston were on-duty police
officers working for the City of Norfolk.  At around 1:00 a.m.,
Folston received a call to transport a prisoner.  Shortly
thereafter, Bennett was dispatched to a domestic disturbance
call in the Tidewater Gardens area of Norfolk.  Folston
overheard the dispatcher assign Bennett to investigate the
domestic disturbance call and decided to provide backup for
Bennett rather than respond to the transport call.  Folston
later explained that he decided to go because he was near
Officer Bennett's location while the unit actually assigned to

1

backup Bennett was "across the city," and the police department required a backup unit for domestic disturbance calls.

In assigning Bennett to investigate the domestic disturbance call, the dispatcher did not assign a response code. According to Norfolk Police Department General Order OPR-710 ("OPR-710"), "[w]hen no specified response code is assigned to the message, response Code 3 will be used." OPR-710 also dictates that, on calls designated Code 3, "[e]mergency lights and/or siren will not be used. All posted signs and traffic laws will be observed." In addition to delineating Response Codes, OPR-710 also establishes when a police officer is authorized to engage in "emergency vehicle operation."[1]

In responding to the call, both officers began to drive across the Campostella Bridge. While Bennett did not know how fast he was traveling, Folston admitted to exceeding the speed limit after being passed by Bennett and to falling in line behind him as they drove up the bridge. At no point did either officer activate his emergency lights or sirens.

After cresting the crown of the bridge, Bennett began slowing down. At that point, Bennett saw Worsley riding on his bicycle, swerving, in the middle of the left lane, which was the same lane in which Bennett was driving. Upon seeing Worsley,

---

[1] The operation of emergency equipment and driving in excess of the speed limit are considered aspects of "emergency vehicle operation."

Bennett came to a quick stop.  Worsley subsequently swerved his bicycle into the right lane, where he was then hit by Folston, who had maneuvered into that lane to avoid hitting Bennett's vehicle.  Tragically, Worsley died as a result of injuries sustained when he was struck by Folston's vehicle.

McBride, as Administrator of Worsley's estate, filed a simple negligence[2] claim against Bennett and Folston, individually and as employees of the City of Norfolk, seeking damages for Worsley's wrongful death as a result of their misconduct.  Bennett and Folston filed special pleas in bar on the grounds of sovereign immunity.  After hearing testimony from Bennett and Folston at an ore tenus hearing, the trial court sustained the special pleas in bar.  The trial court held that Bennett and Folston were entitled to sovereign immunity because they had exercised discretion in determining whether and how to respond to the dispatch.

McBride appeals.

## II.  ANALYSIS

The issue of whether a municipal employee is entitled to sovereign immunity is a question of law that we review de novo. City of Chesapeake v. Cunningham, 268 Va. 624, 633, 604 S.E.2d 420, 426 (2004).  Although we review the trial court's decision

---

[2] McBride initially filed a gross negligence claim but later amended her complaint, withdrawing the gross negligence claim and proceeding on a claim of simple negligence.

de novo, we also recognize that, when evidence is presented "on [a] plea ore tenus, the circuit court's factual findings are accorded the weight of a jury finding and will not be disturbed on appeal unless they are plainly wrong or without evidentiary support."  Hawthorne v. VanMarter, 279 Va. 566, 577, 692 S.E.2d 226, 233 (2010).

Where a municipal employee is charged with simple negligence, this Court has established a four factor test for determining whether sovereign immunity applies.  James v. Jane, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980).  These factors are: (1) the nature of the function performed by the employee; (2) the extent of the state's interest and involvement in the function; (3) the degree of control and direction exercised by the state over the employee; and (4) whether the act complained of involved the use of judgment and discretion.  Id.  In the present case, only the fourth factor is at issue.

Recognizing that "[v]irtually every act performed by a person involves the exercise of some discretion," James, 221 Va. at 53, 282 S.E.2d at 869, this Court has explained that there are additional considerations involved in assessing the use of judgment and discretion in driving situations.  With regard to the fourth factor, this Court has explained that "[t]he defense of sovereign immunity applies only to acts of judgment and discretion which are necessary to the performance of the

4

governmental function itself." Heider v. Clemons, 241 Va. 143, 145, 400 S.E.2d 190, 191 (1991). In situations involving the exercise of judgment and discretion by government employees while driving, we look to whether the means of effectuating the applicable government function involves "ordinary driving in routine traffic" versus driving that requires a "degree of judgment and discretion beyond ordinary driving situations in routine traffic." Friday-Spivey v. Collier, 268 Va. 384, 390-91, 601 S.E.2d 591, 595 (2004). Sovereign immunity attaches in the latter situation, but not in the former. Id.; Colby v. Boyden, 241 Va. 125, 129, 400 S.E.2d 184, 187 (1991).

In further refining the analysis applied in determining the types of driving to which sovereign immunity attaches, this Court has acknowledged that "[u]nlike the driver in routine traffic, [a government employee in an emergency situation] must make difficult judgments about the best means of effectuating the governmental purpose by embracing special risks." Colby, 241 Va. at 129-30, 400 S.E.2d at 187. When embracing special risks, government employees are necessarily called upon to make "split-second decisions balancing grave personal risks, public safety concerns, and the need to achieve the governmental objective." Id. Such split-second decisions may lead to negligent acts, which can result in death or serious injury, as the present case demonstrates. At the same time, the failure to

make such split-second decisions could similarly result in death or serious injury, and one of the purposes served by sovereign immunity is to "eliminate[] public inconvenience and danger that might spring from officials being fearful to act." Messina v. Burden, 228 Va. 301, 308, 321 S.E.2d 657, 660 (1984). Therefore, our jurisprudence is clear that, in the context of driving a vehicle, whether the act in question involves the requisite exercise of discretion such that sovereign immunity applies depends on whether that act embraces "special risks" in order to effectuate a governmental purpose.

Applying this standard, we have recognized that sovereign immunity applies to an officer engaged in vehicular pursuit, Colby, 241 Va. at 130, 400 S.E.2d at 187, or a firefighter responding to a car fire, National Railroad Passenger Corp. v. Catlett Volunteer Fire Co., 241 Va. 402, 413-14, 404 S.E.2d 216, 222 (1991), but does not apply to a deputy serving judicial process, Heider, 241 Va. at 144-45, 400 S.E.2d at 190-91, or a firefighter engaged in "ordinary driving in routine traffic" while responding to a nonemergency, "public service call," Friday-Spivey, 268 Va. at 390, 601 S.E.2d at 594. In each case, the application of sovereign immunity turned on whether a government employee exercised judgment and discretion in determining what actions to take, whether the actions taken were

6

necessary to effectuate a governmental purpose and whether those actions inherently required them to embrace "special risks."

In cases like the present one, the proper application of sovereign immunity should not be based upon a court second-guessing a split-second decision made by a government employee effectuating a governmental function by embracing special risks. If that were the case, sovereign immunity would be rendered meaningless. Rather, the proper application of sovereign immunity requires a court to make an objective determination as to whether the decision made and the actions taken pursuant thereto were necessary to the performance of a governmental function and embraced special risks. In other words, the application of sovereign immunity in a case involving the operation of a motor vehicle by a government employee is an objective determination considered in light of all the circumstances including the government employee's assessment[3] of

---

[3] While not dispositive, a government employee's assessment is still relevant to the application of sovereign immunity. The government employee's assessment of the situation provides valuable context relating to what governmental function was being effectuated (e.g., an officer on routine patrol versus responding to a crime in progress) and whether the actions taken were "necessary to the performance of the governmental function itself." Heider, 241 Va. at 145, 400 S.E.2d at 191. Context also addresses the question of whether the government employees were exercising judgment and discretion in deciding how best to discharge their duties.

Indeed, we have recognized that one cannot meaningfully divorce the reason why a government employee responded to a particular situation from how the government employee responded.

the situation. Nonetheless, the test is objective in nature. The driver's evaluation of the situation must be objectively reasonable to permit the application of sovereign immunity.

In the present case, Bennett and Folston determined that it was necessary for them to respond to the domestic disturbance call in an emergency manner and proceeded to do so. In so doing, Bennett and Folston exercised their judgment and discretion. See Colby, 241 Va. at 130, 400 S.E.2d at 187 (recognizing that "[t]he exercise of discretion is involved even in the initial decision to undertake [a particular course of action]"). Furthermore, determining the proper response to a criminal act (e.g., a domestic disturbance) and implementing that response clearly involve the exercise of judgment and discretion in the performance of a governmental function. Similarly, the operation of their vehicles in an emergency manner involved speeds in excess of the speed limit and, thus, went beyond "ordinary driving in routine traffic." Friday-

---

See Burns v. Gagnon, 283 Va. 657, 676-77, 727 S.E.2d 634, 646 (2012) (analyzing a government employee's assessment of the situation to explain why the employee's actions (or lack thereof) demonstrated an exercise of judgment and discretion). Thus, a government employee's assessment of the situation is a relevant consideration. However, that consideration must necessarily be tempered by an objective examination of the circumstances. See Friday-Spivey, 268 Va. at 390-91, 601 S.E.2d at 595 (determining that the facts of the case did not support the defendant's classification of the situation as an "emergency").

8

<u>Spivey</u>, 268 Va. at 390, 601 S.E.2d at 594. Therefore, in exercising their judgment and discretion about the best means of effectuating a governmental function by embracing the requisite special risks, Bennett and Folston triggered the application of sovereign immunity.

McBride further takes issue with the fact that the officers had no specific knowledge about the particular call because the domestic disturbance call was not initially declared to be an emergency by the dispatcher. McBride asserts that sovereign immunity cannot apply because, under those circumstances, Bennett and Folston had no authority to engage in emergency vehicle operation under OPR-710. While the existence of such a policy may be relevant to any internal disciplinary actions that Bennett and Folston may face, it is not dispositive of the present issue. Rather, OPR-710 merely demonstrates that the City of Norfolk Police Department has exercised administrative control and supervision over the officers. <u>See</u> <u>Colby</u>, 241 Va. at 129, 400 S.E.2d at 187.

In <u>Colby</u>, this Court held that policies or guidelines like OPR-701 "do not, and cannot, eliminate the requirement that a police officer, engaged in the delicate, dangerous, and potentially deadly job of vehicular pursuit, must make prompt, original, and crucial decisions in a highly stressful situation." <u>Id.</u> This holding implicitly acknowledges the fact

9

that no policy can account for every situation a police officer may face. Indeed, at least one court has recognized that there may be situations where the strict application of such policies may not be the most prudent course of action. See Muse v. Schleiden, 349 F.Supp.2d 990, 997-98 (E.D. Va. 2004). Rather, such decisions are best left to the judgment and discretion of the officer. Id. It is this exercise of judgment and discretion, even in violation of policy, that allows for the invocation of sovereign immunity.[4]

### III. CONCLUSION

In National Railroad Passenger Corp., we concluded that sovereign immunity attached because we could not "logically distinguish the act of crossing a railroad track without stopping in order to extinguish a fire from running a red light in order to apprehend a traffic offender." 241 Va. at 413, 404 S.E.2d at 222. Similarly, we cannot logically distinguish the act of speeding to respond to a domestic disturbance call. Accordingly, we will affirm the decision of the trial court.

Affirmed.

---

[4] We further observe that each police department in the Commonwealth likely has different policies or guidelines. A standard for determining sovereign immunity that relied heavily on such policies or guidelines would result in an inconsistent application of this doctrine: the acts of an officer in one jurisdiction might be covered by sovereign immunity, while the same acts of another officer in the exact same situation but in a different jurisdiction would not.

10

CHIEF JUSTICE KINSER, with whom JUSTICE McCLANAHAN joins, concurring.

As reflected by the various views expressed in this case and in Anders v. Kidd, Record No. 131891 (this day decided), the application of the doctrine of sovereign immunity over the years to ever-changing circumstances has produced less than clear guidelines for the resolution of future cases. The majority's resolution of the case before us adds to the complexity that permeates the law of sovereign immunity by adding a new factor, whether "the government employee's assessment of the situation" in deciding "how" to respond is objectively reasonable. Our precedent does not support second-guessing "how" an individual seeking the protection of sovereign immunity responded in a particular situation, even if judged by an objective standard. Instead, we have made an objective determination by asking whether effectuating the governmental purpose of the individual's employer required the exercise of discretion and judgment. Applying that analysis in this case, I conclude that the circuit court correctly held that the defendants, Joey Gaylan Bennett, Jr. and Derek Michael Folston, were protected by sovereign immunity. Thus, I respectfully concur.

To determine whether an individual working for an immune governmental entity is entitled to the protection of sovereign immunity, we apply a four-part test first enunciated in James v.

11

*Jane*, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980). See *Messina v. Burden*, 228 Va. 301, 313, 321 S.E.2d 657, 663 (1984). The four factors are: "(1) the nature of the function the employee performs; (2) the extent of the government's interest and involvement in the function; (3) the degree of control and direction exercised over the employee by the government; and (4) whether the act in question involved the exercise of discretion and judgment." *Colby v. Boyden*, 241 Va. 125, 129, 400 S.E.2d 184, 186-87 (1991); accord *Nationwide Mut. Ins. Co. v. Hylton*, 260 Va. 56, 63, 530 S.E.2d 421, 424 (2000); *Stanfield v. Peregoy*, 245 Va. 339, 342, 429 S.E.2d 11, 12 (1993).

In the present case, only the fourth prong of the test is at issue. Since we enunciated this test, we have addressed the fourth prong, whether a particular act involved the exercise of discretion and judgment, in a multitude of factual scenarios. See, e.g., *Burns v. Gagnon*, 283 Va. 657, 677, 727 S.E.2d 634, 646 (2012) (holding that a high school vice principal's response (or lack thereof) to a student's report about an impending fight "involved the exercise of judgment and discretion" because he had to decide whether to respond, when to respond, and how to respond);[1] *Gargiulo v. Ohar*, 239 Va. 209, 215, 387 S.E.2d 787,

_____

[1] In *Burns*, we did not examine whether the vice-principal's decision about "how" to respond was objectively reasonable. We only recognized that he necessarily had to exercise discretion and judgment in deciding whether, when, and how to respond.

12

791 (1990) (concluding that in performing duties as a fellow in a research project, a physician exercised discretion and judgment in diagnosing and treating participating patients); Lentz v. Morris, 236 Va. 78, 83, 372 S.E.2d 608, 611 (1988) (holding that "a teacher's supervision and control of a physical education class . . . clearly involves, at least in part, the exercise of judgment and discretion by the teacher"); Messina, 228 Va. at 313, 321 S.E.2d at 664 (granting sovereign immunity to a chief of the operations division of a county public works department because his supervisory activities "clearly involved judgment and discretion").

In situations involving the operation of a motor vehicle by an employee of an immune governmental entity, we have recognized, however, that every person driving a vehicle "must make myriad decisions" and thus have held that "in ordinary driving situations the duty of due care is a ministerial obligation." Heider v. Clemons, 241 Va. 143, 145, 400 S.E.2d 190, 191 (1991). In deciding whether the operation of a vehicle in a particular situation was ministerial or discretionary, we repeatedly have focused on whether the "operation of [the] vehicle involved special risks arising from the governmental activity and the exercise of judgment or discretion about the proper means of effectuating the governmental purpose of the defendant's employer." Stanfield, 245 Va. at 344, 429 S.E.2d at

13

13-14; see also Colby, 241 Va. at 129, 400 S.E.2d at 187 (asking whether a police officer in vehicular pursuit of a fleeing lawbreaker had to make "difficult judgments about the best means of effectuating the governmental purpose by embracing special risks"). We have differentiated between drivers in situations necessarily requiring "discretionary, split-second decisions balancing grave personal risks, public safety concerns, and the need to achieve the governmental objective," Colby, 241 Va. at 129-30, 400 S.E.2d at 187, and drivers involved in "the simple operation of a vehicle in routine traffic." Smith v. Settle, 254 Va. 348, 353 n.7, 492 S.E.2d 427, 430 n.7 (1997). While the former is deemed conduct involving the exercise of discretion and judgment and thus protected by sovereign immunity against charges of simple negligence, the latter is not.

For example, in Colby, a law enforcement officer was pursuing a motorist who had violated a traffic law. 241 Va. at 127, 400 S.E.2d at 185-86. During the pursuit, the officer proceeded to cross an intersection against a red traffic light, colliding with another vehicle. Id. at 127, 400 S.E.2d at 186. Affirming the trial court's judgment sustaining the officer's plea in bar based on sovereign immunity, we concluded that "a police officer, engaged in the delicate, dangerous, and potentially deadly job of vehicular pursuit, must make prompt, original, and crucial decisions in a highly stressful

14

situation." Id. at 129, 400 S.E.2d at 187. Although his municipal employer exercised "administrative control and supervision over [the officer's] activities through the promulgation of guidelines governing actions taken in response to emergency situations," we determined that those guidelines could not eliminate the need for the officer to make discretionary decisions during the course of vehicular pursuit. Id. Thus, we held that, "unlike the driver in routine traffic," the police officer was cloaked with the protection of sovereign immunity. Id.

Similarly, in National Railroad Passenger Corp. v. Catlett Volunteer Fire Co., 241 Va. 402, 404 S.E.2d 216 (1991), we addressed whether a volunteer fireman was immune from liability under the doctrine of sovereign immunity for an accident that occurred while the fireman was driving a fire truck to the site of a fire. Id. at 405, 404 S.E.2d at 217. The fireman proceeded through a railroad crossing without stopping, and a train struck the fire truck. Id. The railroad company asserted that the fireman was not entitled to the defense of sovereign immunity because his act of crossing the railroad tracks without first stopping "was a ministerial act, not a discretionary act to which sovereign immunity attaches." Id. at 413, 404 S.E.2d at 222. Disagreeing, we concluded that, like the police officer in Colby, the fireman was exercising discretion and judgment

15

about the best means of effectuating the governmental purpose and in doing so was embracing special risks. Id. See also Smith, 254 Va. at 353 n.7, 492 S.E.2d at 430 n.7 (holding that an ambulance driver traveling to a location where he could establish radio contact with his other squad members to determine whether he was needed at the scene of an emergency was not engaged in "the simple operation of a vehicle in routine traffic" because the trip "involved the exercise of discretion and judgment required by a person performing a governmental function in operating a vehicle in response to an emergency").

We again applied the same analysis in Stanfield, which did not involve an emergency situation. There, the defendant-driver was operating a city truck and spreading salt during a snowstorm when his truck collided with another vehicle. 245 Va. at 340, 429 S.E.2d at 11. In concluding that the driver was entitled to the protection of sovereign immunity, we stated that "the conduct of driving and spreading salt combined [is] an integral part of the governmental function of rendering the city streets safe for public travel" and that "the operation of this vehicle involved special risks arising from the governmental activity and the exercise of judgment or discretion about the proper means of effectuating the governmental purpose." Id. at 344, 429 S.E.2d at 13-14. We explained that if the "accident had happened as defendant was driving his truck en route to the area

16

he was assigned to plow and salt, or if it occurred when he was returning to his . . . headquarters after completing his function of plowing and salting, he would have been engaged in 'the simple operation' of the truck 'in routine traffic,' a ministerial act."  Id. at 344, 429 S.E.2d at 13 (quoting Heider, 241 Va. at 145, 400 S.E.2d at 191 and Colby, 241 Va. at 129, 400 S.E.2d at 187).  Compare Wynn v. Gandy, 170 Va. 590, 595, 197 S.E. 527, 529 (1938) (holding that driving a school bus while not transporting children did not involve judgment or discretion but was purely ministerial) and Heider, 241 Va. at 145, 400 S.E.2d at 191 (holding that a police officer who was involved in an accident while operating his vehicle after serving judicial process was not exercising "judgment and discretion about the proper means of effectuating the governmental purpose of" his employer but was engaged in "the simple operation of an automobile [that] did not involve special risks arising from the governmental activity") with Linhart v. Lawson, 261 Va. 30, 36, 540 S.E.2d 875, 878 (2001) (holding that a school bus driver's act of transporting children did involve the exercise of judgment and discretion).

In none of these cases did the Court look at "how" the defendant chose to respond and decide whether the response was objectively reasonable.  For example, in Stanfield, we did not ask whether the defendant's decision, as he was spreading salt

17

on a city street, to attempt to stop at a stop sign located at an intersection was objectively reasonable. 245 Va. at 342, 429 S.E.2d at 12. Instead, the driver was exercising the requisite discretion and judgment because, to effectuate the governmental purpose, he had to decide not only "whether a particular street needed to be salted, plowed, or a combination of both" but also whether to spread salt on the entire street and how much salt to spread. Id. Thus, we concluded that "[t]he operation of the truck in snow and ice to effectuate a governmental purpose clearly involved, at least in part, the exercise of judgment and discretion by the driver." Id. at 343, 429 S.E.2d at 13. See also Smith, 254 Va. at 353 n.7, 492 S.E.2d at 430 n.7; National R.R. Passenger Corp., 241 Va. at 413, 404 S.E.2d at 222; Colby, 241 Va. at 129, 400 S.E.2d at 187.

Obviously, the facts and circumstances in each case are relevant to understanding the precise governmental function at issue and whether effectuating that function requires the exercise of discretion and judgment. But, we have not looked past that point and examined "how" the driver chose to respond. Instead, we simply asked whether an employee of an immune governmental entity, while driving an automobile, was engaged in routine driving or driving that involved the exercise of judgment and discretion.

If it is necessary for the government employee to demonstrate on an objective basis that the actions taken were reasonable, this new factor introduced by the majority essentially deprives the doctrine of sovereign immunity of its purpose: it will only provide government employees with immunity from negligence claims if they were not negligent in responding to the circumstances they faced.[2]  See Litchford v. Hancock, 232 Va. 496, 499, 352 S.E.2d. 335, 337 (1987) (stating that the driver of a vehicle is negligent if the driver fails "to use ordinary care to observe other vehicles on the highway, to see what a reasonable person would have seen, and to react as a reasonable person would have reacted under the circumstances to avoid a collision"); Smith v. Lamar, 212 Va. 820, 823, 188 S.E.2d 72, 74 (1972) (holding that "reasonable care" or "ordinary care" is that "degree of care which an ordinary

_____

[2] Sovereign immunity protects a defendant working for an immune governmental entity against only claims for simple negligence.  See Green v. Ingram, 269 Va. 281, 290, 608 S.E.2d 917, 922 (2005); National R.R. Passenger Corp., 241 Va. at 414, 404 S.E.2d at 222.  Thus, when "a defendant's actions are clothed with sovereign immunity, a plaintiff must establish gross negligence in order to prevail."  Colby, 241 Va. at 130, 400 S.E.2d at 187.  In exercising judgment and discretion to effectuate a governmental purpose, if a defendant does so in such a manner that shows "indifference to others as constitutes an utter disregard of prudence amounting to complete neglect of the safety of [another], that is, such a degree of negligence as should shock fair minded men although something less than willful recklessness," the defendant is liable for gross negligence.  Laster v. Tatum, 206 Va. 804, 807, 146 S.E.2d 231, 233 (1966) (internal quotation marks omitted); accord Green, 269 Va. at 290-91, 608 S.E.2d at 922.

19

prudent person would exercise under the same or similar circumstances to avoid injury to another").  Also, if a government employee has successfully demonstrated that the actions taken were objectively reasonable, I question whether that employee could ever then be liable for gross negligence.

At a minimum, if this new factor is appropriate, the majority should acknowledge its departure from our precedent and explain why it is necessary.  Moreover, in the case before us, the majority does not apply this new factor.  The majority never decides whether the decisions by Bennett and Folston to drive their vehicles in excess of the speed limit without lights and sirens were objectively reasonable.  Instead, the majority concludes, by utilizing the approach supported by our precedent, that "determining the proper response to a criminal act (i.e., a domestic disturbance) and implementing that response clearly involves the exercise of judgment and discretion in the performance of a governmental function."

Nevertheless, I conclude, like the majority, that the circuit court did not err in sustaining the special pleas in bar based on sovereign immunity filed by Bennett and Folston.  As police officers, they were effectuating the governmental function of responding to a domestic disturbance call.  Like the police officer in Colby and the driver spreading salt in Stanfield, the operation of their respective vehicles entailed

20

"special risks arising from the governmental activity and the exercise of judgment or discretion about the proper means of effectuating the governmental purpose." Stanfield, 245 Va. at 344, 429 S.E.2d at 14. For that reason, they are entitled to the protection of sovereign immunity. Whether their decisions about "how" to respond were objectively reasonable, even though the dispatch assigned no response code to the call, is not determinative.

I recognize, however, that this Court utilized a different approach in Friday-Spivey v. Collier, 268 Va. 384, 601 S.E.2d 591 (2004). There, a fire truck collided with a motor vehicle after the fire truck driver failed to yield the right-of-way. Id. at 386, 601 S.E.2d at 592. The fire technician was responding to a "Priority 2" dispatch regarding an infant locked in a vehicle. Id. at 387, 601 S.E.2d at 592. Under that protocol, the technician "was required to proceed without activating warning devices, i.e., 'no lights and no sirens,' and to obey all statutes governing the operation of motor vehicles." Id.

In reversing the trial court's judgment holding that this driver was protected by the doctrine of sovereign immunity, the Court relied on both the protocol and the technician's testimony, admitting "that, based on what he knew at the time, 'there was no danger' involved in the call to which they were

21

responding and he understood that 'when [he] got a [Priority 2] call, [he was] to respond in a nonemergency manner and conform to all the traffic regulations.'" Id. at 390, 601 S.E.2d at 594. When asked whether "there [was] any difference in the way you respond to a call for a cat in a tree versus an infant locked in a car, according to [the] regulations," he responded, "[my] regulations, no." Id.

The Court's reliance on the fire department operating procedures and the fire technician's testimony admitting that he knew there was no danger involved in the call represented a departure from our precedent applying the doctrine of sovereign immunity. We specifically had rejected the use of guidelines and operating procedures in Colby and National Railroad Passenger Corp. And, in determining whether the operation of a vehicle involved the exercise of discretion and judgment, the Court had not previously examined a driver's subjective assessment about the nature of the specific situation at issue and how to respond in deciding whether the driver was protected by sovereign immunity. In my view, the approach followed in our cases before Friday-Spivey should be applied in the case before us, and to the extent that Friday-Spivey suggests that the application of sovereign immunity turns on such subjective assessments or internal policies and operating procedures, it should be overruled.

22

For these reasons, I respectfully concur and would affirm the circuit court's judgment.


JUSTICE MIMS, dissenting.

Because a public employee who flagrantly violates a direct order is acting outside the limits of his or her permissible judgment and discretion, I dissent.

### Facts

Donnell Worsley spent much of the last day of his life at his mother's house with family. In the early evening, he attended the birthday party of a family friend. He returned to his mother's house and then rode his bike home. The night was clear. The roads were dry and well-lit.

Worsley never made it home. As he pedaled his bike on the Campostella Bridge, two police cruisers were approaching at high speed behind him.

Officer Bennett had received a call for a "disorderly trespasser or disturbance or something of that nature" in the Tidewater Gardens community. Officer Folston had previously received a call from dispatch to transport a prisoner. He disregarded that call without permission when he overheard Officer Bennett take the call for the "disturbance."

The cruiser was "full throttle," "pedal down to the floor" as Folston drove up the bridge. Coming down, the officers began

23

to slow slightly, because they were going too fast to make an upcoming turn. Suddenly, Bennett hit his brakes and came to a complete stop as he encountered Worsley. Folston swerved to avoid rear-ending Bennett's cruiser. As he did, he struck Worsley. The impact threw Worsley onto the windshield, which shattered. Folston's cruiser dragged the crumpled bicycle more than 200 feet.

The officers were not using their sirens or emergency lights. There is evidence that the cruisers reached speeds between eighty and eighty-eight miles per hour.

Bennett and Folston were each indicted on one charge of involuntary manslaughter and two charges of reckless driving. In Bennett's case, the involuntary manslaughter charge and one of the two charges of reckless driving were nolle prossed. The Circuit Court of the City of Norfolk convicted Bennett of the remaining reckless driving charge. Folston entered an Alford Plea to one of the reckless driving charges, and the remaining charges were nolle prossed.

### Discussion

The majority concludes that sovereign immunity attached to the officers' actions while responding to the uncategorized disturbance call, despite the clear and express order issued by the Norfolk Chief of Police to treat such calls as nonemergency responses while observing "[a]ll posted signs and traffic laws." Because they violated an express order that dictated the limits of their permitted judgment and discretion in the performance of

24

this government function, our precedent dictates that they cannot hide behind the shield of sovereign immunity.

1.   Norfolk Police Department General Order OPR-710

The majority opinion fails to give due regard to Norfolk Police Department General Order OPR-710 ("General Order").  As the Court has explained: "Whether the act performed involves the use of judgment and discretion is a consideration, but it is not always determinative. . . . Of equal importance is the degree of control and direction exercised by the [governmental body] over the employee whose negligence is involved."  James v. Jane, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980) (emphasis added).  The General Order exercises clear control and direction for the emergency operation of police vehicles, which constrains officers' otherwise-permitted judgment and discretion.  Bennett and Folston flagrantly disregarded this order and, therefore, were acting outside the limits of their authority.  They exercised no permissible "judgment and discretion" in unilaterally choosing to speed recklessly without sirens or emergency lights.

The structure of the General Order makes it clear that there are four situations in which "emergency vehicle operation" is authorized.  If one of those four situations applies, then police officers may assess ten factors to determine the appropriate response to the emergency situation.

The relevant sections of the General Order (I, II, and V) are printed in their entirety below:

**I. <u>Policy</u>**

Sworn personnel will operate police vehicles in emergency situations in the safest possible manner, consistent with law enforcement responsibilities, and in accordance with the procedures contained in this order.

**II. <u>Emergency Operation of Police Vehicles</u>**

In undertaking any emergency vehicle operation, officers must balance the seriousness of the situation and the importance of the law enforcement objective involved against the hazards to the safety of citizens and police personnel involved.

A. Emergency vehicle operation is authorized during the following:

1. When the immediate presence of the police is required in order to protect a person from possible death or serious injury.

2. When the telecommunicator dispatches a message with a response Code 1 or 2.

3. When directly authorized by a supervisor.

4. When engaged in a vehicular pursuit.

B. Officers are expected to exercise good judgment as to the necessity and justification for operating their vehicles under emergency conditions. Factors and conditions to be assessed by officers prior to and during the emergency operation of the police vehicle include, but are not limited to, the following:

1. Nature and seriousness of offense or call
2. Weather conditions
3. Road surface conditions
4. Traffic conditions
5. Time of day
6. Knowledge of area
7. Ability to control vehicle
8. Type of vehicles involved
9. Availability of assisting units
10. Geographic location – school, residential, business, etc.

. . . .

V. **Response Codes**

A. Code 1- With due regard for safety, emergency lights and siren must be used at all times when operating a vehicle in excess of the speed limit, or contrary to other traffic regulations, regardless of the time of day or the location. Speed limits will not be exceeded by more than 15 mph, except during pursuits.

B. Code 2- With due regard for safety, emergency lights must be used at all times and siren used as necessary. Police units will come to a full stop at each red light, then proceed through the intersection only if it is possible to do so without danger to pedestrians or vehicles. All other traffic controls will be approached with extreme caution. Speed limits will not be exceeded by more than 5 mph.

C. Code 3- Emergency lights and/or siren will not be used. All posted signs and traffic laws will be observed. When no specified response code is assigned to the message, response Code 3 will be used.

Pursuant to the plain language of subsection (II)(A) of the General Order, an officer is authorized to engage in "emergency

27

vehicle operation" in only four scenarios: (1) when his or her immediate presence is required to protect a person from possible death or serious injury; (2) when the dispatch has a response Code 1 or 2; (3) when directly authorized by a supervisor; or (4) when engaged in a vehicular pursuit. <u>Only</u> if one of these four scenarios applies does the officer then have authority to exercise independent judgment and discretion to disregard traffic laws. To guide officers in the exercise of this judgment and discretion, subsection (II)(B) provides a list of ten factors for consideration. But these factors do not come into play unless the officer is first authorized to engage in "emergency vehicle operation" pursuant to one of the four prongs of subsection (II)(A).

In this case, the domestic disturbance call from the dispatcher was not assigned a code, and therefore it was required to be treated as Code 3. It did not involve vehicular pursuit. The officers were not authorized by their supervisors to treat it as an emergency situation.

Thus, the only possible basis for engaging in "emergency vehicle operation" under the policy was if "the immediate presence of the police [wa]s required in order to protect a person from possible death or serious injury." The majority opinion makes no attempt to argue that scenario applies. Indeed, the majority makes the conclusory assertion that

28

"Bennett and Folston determined that it was necessary for them to respond to the domestic disturbance call in an emergency manner."  However, there are no facts in the record to support that conclusion.  To the contrary, the dispatcher, who was aware of the facts, decided not to code the response.  That was a factual determination that the officers' "immediate presence" was <u>not</u> required to prevent death or serious injury.

The majority concludes that Folston's unilateral and unauthorized decision to back up Bennett (even though the dispatcher had already assigned back up), coupled with their collective, unauthorized decision to speed recklessly to the call without sirens or lights--again, unauthorized--was enough to trigger sovereign immunity.  I disagree.[1]

Whether a dispatch falls within one of the General Order's authorizations for "emergency vehicle operation" is an objective

---

[1] In fact, the officers did not comply with the General Order's mandates for Code 1 or Code 2 emergency operation either.  In other words, Bennett and Folston did not respond in any sort of authorized manner; they just drove fast.  As the accident report indicates, the speed limit in the area was 30 mph, and Folston surmised that he was probably driving 45-50 mph at the time of the crash (despite having the "pedal down to the floor" going up the bridge), while Bennett indicated that he reached speeds around 60 mph.  Code 1 operation requires that "[s]peed limits will not be exceeded by more than 15 mph, except during pursuits."  Under Code 1, "emergency lights and siren must be used at all times when operating a vehicle in excess of the speed limit . . . regardless of the time of day or the location."  Under Code 2, which requires use of lights and requires intermittent use of sirens, "[s]peed limits will not be exceeded by more than 5 mph."

determination that must be based on the specific facts about that particular dispatch known by the officer at the time of response. Generalized knowledge regarding the character of the area or the type of call cannot suffice. Otherwise, an officer could overrule a dispatcher's assigned response code and treat the call as an emergency based on nothing more than after-the-fact, self-serving conjecture. Such a result would effectively nullify the Norfolk Police Department's established system of response codes and nullify the direct order of the Norfolk Chief of Police.

2. Friday-Spivey v. Collier Controls this Case

These facts place this case squarely within the rule of Friday-Spivey v. Collier, 268 Va. 384, 601 S.E.2d 591 (2004), which the Court decided a mere decade ago. It remains binding authority in the Commonwealth; it has not been overruled or limited. Therein, the Court drew a clear line between driving in emergency conditions that embraces "special risks" and "ordinary driving situations," derived from the Fairfax County Fire and Rescue Department Standard Operating Procedures.

In Friday-Spivey, we refused to grant sovereign immunity to a fire truck driver who collided with a motorist while responding to a "Priority 2" call indicating that an infant was locked in a parked car. Id. at 390-91, 601 S.E.2d at 594-95. Under the Fairfax County Fire and Rescue Department Standard

Operating Procedures, the driver was "required" to proceed without emergency equipment and "to obey all statutes governing the operation of motor vehicles." Id. at 387, 601 S.E.2d at 592. Similar to the facts in this case, the driver was not using his emergency lights or siren, but failed to yield the right of way to another vehicle. Id. at 386-87, 601 S.E. at 592-93. He testified that he had exercised his discretion to determine the "quickest route possible" because he "just [did not] know what to expect when [he got] there." Id. at 387, 601 S.E.2d at 593. The Court held that, "[d]espite a natural inclination to classify the report of a child in a locked car as an 'emergency,'" he was not required to "exercise . . . discretion beyond that required for ordinary driving in routine traffic situations." Id. at 390, 601 S.E.2d at 594. Thus, the driver was performing a ministerial function to which sovereign immunity did not apply. Id. at 391, 601 S.E.2d at 595.

The majority makes no attempt to distinguish the facts of Friday-Spivey from the facts of this case. Moreover, there is little effort to address the officers' disobedience of the General Order. Rather, the majority sidesteps the officers' unjustified insubordination with a quote from Colby v. Boyden, 241 Va. 125, 129, 400 S.E.2d 184, 187 (1991): "[T]hose guidelines do not, and cannot, eliminate the requirement that a police officer, engaged in the delicate, dangerous, and

31

potentially deadly job of vehicular pursuit, must make prompt, original, and crucial decisions." However, this ignores a significant factual distinction. In Colby, there were known, objective facts of an emergency situation. Colby applied immunity to a police officer who had observed a traffic infraction committed in his presence, after which the perpetrator fled at a high rate of speed, and who initiated vehicular pursuit. Id. at 127, 130, 400 S.E.2d at 185-187. In fact, in the present case vehicular pursuit is one of the four prongs in the General Order that would have permitted the officers to exercise such judgment and discretion. As discussed in more detail below, and like the driver in Friday-Spivey, Bennett and Folston could point to no specific facts of a defined emergency situation. They had no knowledge that would permit judgment and discretion to speed recklessly without emergency lights or sirens.[2]

Nothing about the call indicated that the immediate presence of the officers was needed to protect anyone from "possible death or serious injury." In fact, when Bennett was

---

[2] Further, unlike the General Order, which requires Norfolk police officers to treat calls with no specific response code as Code 3 nonemergency calls, Virginia Beach Police Department General Order 8.01, addressed in Colby, expressly authorized officers to judge the response required according to the information available to the officer at the time. City of Virginia Beach Police Department, General Order 8.01, at 5, Colby v. Boyden, 241 Va. 125, 129, 400 S.E.2d 184, 187 (1991).

questioned by his supervisors shortly after the accident, he stated that "[t]here was no like excuse or reason for [speeding to get to the scene]." And at the hearing before the circuit court, Bennett agreed that his decision was "not based on any exigent emergency circumstance."

Similarly, Folston, who was not even assigned to respond to the call, acknowledged that there was only "an unidentified problem" and that "[t]here may or may not be a danger." Like the driver in Friday-Spivey who "just [did not] know what to expect when [he got] there," Folston posited that this "unknown" presented an exigent circumstance. Yet the officers could have addressed that exigent circumstance without speeding recklessly through the city and endangering the lives of innocent civilians. For example, they could have learned about the specific facts of the call--or even verified the code--by accessing the computer in the vehicle. Unlike in Colby, based on the specific information available to the officers at the time of the response, there was no emergency involved in the call to which they were responding. Consequently, the General Order mandated that the officers respond to the call in a nonemergency manner.[3]

---

[3] This is distinguishable from Muse v. Schleiden, 349 F.Supp.2d 990 (E.D. Va. 2004), in which the court held that sovereign immunity applied to an officer responding to a domestic violence call. In Muse, the responding officer had

Although the majority opinion cites Friday-Spivey five times, it utterly fails to meaningfully address the importance that we attached to the departmental policy governing emergency vehicle operation in that case.  See 268 Va. at 391, 601 S.E.2d at 595 ("[Defendant] was in routine traffic under a mandate 'to respond in a nonemergency manner and conform to all the traffic regulations.'") (emphasis added).  Make no mistake, the majority opinion vitiates the rule of Friday-Spivey and leaves it with little to no vitality.  In effect, it is overruled *sub silentio*.

The majority opinion establishes a lamentable precedent by casting adrift the determination of "judgment and discretion" from its firm moorings within authority granted by well-reasoned departmental guidance such as the General Order.  There are three reasons to give such guidance due deference.

First, a speeding emergency vehicle is a dangerous weapon, capable of killing innocent civilians, as occurred in this tragic case.  Departmental policies limit that danger: in this instance by requiring activation of sirens and emergency lights to warn unsuspecting motorists and bicyclists when speeding up

---

specific information regarding the circumstances of the call. The dispatch reflected that the caller's daughter had struck him in the face, was standing next to him at the time of the call, and was "out of control." Id. at 992.  From those facts, the officer reasonably determined that an assault was in progress and that he needed to get to the call as quickly as possible. Id. at 996.

to fifteen miles per hour over the speed limit and prohibiting speeds in excess of that, except during pursuit.

Second, such policies--particularly when expressed as commands such as the General Order--limit the authority, and therefore the permitted judgment and discretion, of public employees for good purpose.  They are intended to prevent free-lancing, and ensure respect for the chain of command.  In this instance, a superior officer could have authorized emergency operation, but no such request was made.

Third, though courts may desire a single statewide standard that neatly categorizes "judgment and discretion" in all instances, proper judicial respect for local policies reflects due consideration of the Commonwealth's diversity.  Judgment and discretion on the crowded city streets of Norfolk or the sprawling highway network of Fairfax County will necessarily involve different factors than on the less-traveled rural roads of Lee County.  Departmental orders and policies reflect the unique traffic conditions that are likely to be faced in each locality.  The Chief of Police in the City of Norfolk is better able to provide useful guidance to officers than a court one hundred miles away.  And when that guidance is flagrantly violated, no court should provide a shield of immunity from civil consequences.

3.   An Objective Determination Regarding the Application of
     Sovereign Immunity

I agree with the majority's proposition that "the proper application of sovereign immunity requires a court to make an objective determination as to whether the decision made and the actions taken pursuant thereto were necessary to the performance of a governmental function and embraced special risks." However, I disagree with the majority's conclusion that Bennett and Folston possessed or exercised sufficient judgment and discretion to trigger application of sovereign immunity.  Their Chief of Police had already issued an order that required a nonemergency response, thereby significantly limiting such judgment and discretion.

Moreover, I disagree that their decision was "necessary." The Norfolk Chief of Police had already made the "necessary decision" that controlled how officers must respond.  The only decision Bennett and Folston had to make was whether to act within their authority and abide by the General Order or whether to engage in insubordination.  They chose to ignore the order, and Donnell Worsley's tragic and preventable death was the result.

According to the majority's logic:

[T]he operation of their vehicles in an emergency
manner involved speeds in excess of the speed limit
and, thus, went beyond "ordinary driving in routine
traffic." . . .   Therefore, in exercising their

36

> judgment and discretion about the best means of effectuating a governmental function by embracing the requisite special risks, Bennett and Folston triggered the application of sovereign immunity.

This reasoning is circular. Bennett and Folston treated a Code 3, nonemergency situation as an emergency, without authorization from their superiors or justification based on specific, objective facts known to them but not their supervisor. They unjustifiably drove their vehicles at excessive, reckless speeds without sirens or emergency lights. Thus, they created the "special risks" that triggered the application of sovereign immunity. This reasoning permits government employees to assume an emergency into existence and respond in a manner that poses "special risks" to themselves and the public while hiding behind the shield of civil immunity.

Officers who obey the orders of their superiors and are engaged in the dangerous and potentially deadly job of responding to emergency situations must make prompt and crucial decisions in the midst of highly stressful conditions. "Such situations involve necessarily discretionary, split-second decisions balancing grave personal risks, public safety concerns, and the need to achieve the governmental objective." Colby, 241 Va. at 129-30, 400 S.E.2d at 187. That principle is sacrosanct. However, the Norfolk Police Department, through the General Order, also requires its officers to make and execute

certain decisions according to clear direction.  The General Order represents the chain-of-command within the police department. It provides an objective means for evaluating official action.  In other words, denying immunity under these circumstances is consistent with internal expectations and standards.  This is not a question of courts second guessing legitimate official actions.  Here, the rules were established beforehand.

As Colby recognizes, there are scenarios where exigent circumstances can authorize an officer to exercise a level of refined discretion that exceeds the language of a policy.  Id. at 129, 400 S.E.2d at 187.  However, raising the shield of sovereign immunity must require a basis in fact, rather than generalization, speculation, or post hoc rationalization.  See id.  The absence of specific facts triggering the need for "prompt, original, and crucial decisions" distinguishes this case from Colby, because the "original" decisions dictating the manner of response under these circumstances had already been made by Bennett's and Folston's superiors.

### Conclusion

Officers Bennett and Folston were under a sworn duty to act within the authority conferred by their badges.  That authority was expressed clearly in the General Order.  That order expressed the policy of their chain of command regarding the

judgment and discretion they were authorized to exercise while driving.  They flagrantly breached their sworn duty when they disregarded the General Order.  They acted far outside their authority.  They ignored their chain of command.

Friday-Spivey is the law of the Commonwealth.  It governs the facts of this case.  It dictates reversal and remand to the trial court for a full trial on the merits.

I dissent.